# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | No.: 1:17-CV-01110-JFC |
| | : | |
| RHONDA J. GORTON, Personal Representative: | | ASBESTOS CASE |
| for the Estate of THOMAS D. GORTON, II, | : | |
| and in her own right, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AIR & LIQUID SYSTEMS | : | |
| CORPORATION, as Successor-by- | : | |
| Merger to Buffalo Pumps, Inc., et al., | : | |
| | : | |
| Defendants. | : | |

---

## AMENDED COMPLAINT

Plaintiff, Rhonda J. Gorton, Personal Representative for the Estate of Thomas D. Gorton, II, and in her own right ("Plaintiff"), by and through her undersigned counsel, Jason B. Duncan, Esquire of the Law Offices of Peter G. Angelos, P.C., hereby files this Amended Complaint and in support thereof avers the following:

### JURISDICTION

Jurisdiction of this Court is founded on 28 U.S.C. Section 1442(a) (1).

1. This case arises out of allegations that Decedent Thomas Gorton II was exposed to various asbestos containing products of various defendants throughout his lifetime. Mr. Gorton was a resident of the Commonwealth of Pennsylvania at the time that his symptoms began to manifest themselves after many years of exposure. This led Mr. Gorton to file a Complaint in Dauphin County, Pennsylvania, in 2012 alleging injuries for Asbestosis. This Complaint was

docketed as 2012-CV-8651-AS. The Complaint was amended three times over the years to add additional defendants, the last amendment was filed on September 11, 2013. After filing his Complaint alleging exposure to numerous asbestos containing products throughout his life time including while a resident of Pennsylvania, Mr. Gorton eventually moved to Montana and Arizona selling his home in Pennsylvania. In May 2017, Mr. Gorton's de bene esse deposition was noticed under his previous filed asbestos complaint in Dauphin County Pennsylvania at 2012-CV-8651-AS. Simultaneously, because there were additional defendants that had not previously been named in his prior Complaint and Amendments, a new complaint was filed in Dauphin County Pennsylvania docketed at 2017-CV-3790-AS, with the intent to consolidate the two matters at a later date, but thereby providing notice to the new defendants in order to allow them to attend the deposition.

2.      The May 2017 Complaint named the following entities as defendants: Air & Liquid Systems Corp. As Successor by Merger to Buffalo Pumps; American Refractories, trading as East Penn Refractories; A.O. Smith Corporation; Aurora Pump Company; AT&T Communications; Abex Corporation; Alliance Machine Company; Allied Signal, Inc.; American Crane Corporation; AT&T Communications of Ohio, Inc.; AT&T Corporation; AT&T, Inc.; AT&T Nevada; AT&T of California, Inc.; Aztec Communications, Inc.; Bayer Cropscience, Inc., as Successor-in-interest to Amchem Products, Inc.; Borgwarner Morse TEC, Inc. as Successor-by merger to Borg-Warner Corporation; CBS Corporation, formerly known as Viacom, Inc., Successor-by-Merger to CBS Corporation, formerly known as Westinghouse Electric Corporation; CertainTeed Corporation;  Cleaver Brooks, Inc.; Columbus McKinnon Corporation;

3

Cooper Industries; Corhart Refractories Company; Crane Company.; Eaton Corporation, as

successor-in-interest to Cutler-Hammer, Inc.; Essex Group, as subsidiary of United

Technologies; Fairmont Supply Company, formerly known as Montfair Industrial Supplies

Company; Ferro Engineering a Division of On Marine Services Company; Ford Motor

Company; Foseco, Inc.; Foster Wheeler Corporation; Gardner Denver, Inc.; General Electric

Company; General Refractories Company; Georgia Pacific, LLC; The Goodyear Tire & Rubber

Company; Greene, Tweed & Company, Inc.; Goulds Pumps Inc.; GTE Products of Connecticut

Corporation, as successor-in-interest to Clark Control, Inc.; HB Fuller Company, formerly known

as AMCHEM Products, Inc., formerly known as Benjamin Foster; Hobart Brothers Company;

Honeywell International, Inc., successor to Allied-Signal, Inc., successor to Bendix Corporation;

IMO Industries, Inc., individually and as Parent Company of and/or Successor to DeLaval Pump

& Steam Turbine Co.;  Industrial Holdings Corporation, f/k/a Carborundum Company; Ingersoll-

Rand Co., Individually and as Parent Corporation and Successor-in-Interest to Terry Steam

Turbines f/k/a Terry Turbines and Blaw-Knox, Co.; J.H. France Refractories Company; John

Crane, Inc. f/k/a Crane Packing Company; Keeler/Dorr-Oliver Boiler Company; The Kerite

Company; The Lincoln Electric Company; Lockheed Martin Corporation, formerly known as

Martin Marietta Coporation; Martin Marietta Materials, Inc.; McCormick Asbestos Company;

Metropolitan Life Insurance Company; Mobil Corporation, parent of Mobil Oil Corporation;

Morgan Engineering, formerly known as Morgan Crane; The Okonite Company; P&H Mining

Equipment, Inc.; Pfizer, Inc.; Pneumo-Abex Corporation, succesor-in-interest to Abex

Corporation, subsidiary of M&F Worldwide; Reading Crane & Engineering; Reunion Industries,

Inc.; RSCC Wire & Cable, Inc.; Schneider Electric, formerly known as Square D. Company;

Union Carbide Corporation; Universal Refractories, a division of Thiem Corporation; Warren

Pumps LLC; Weil-McClain; Zurn Industries, LLC, subsidiary of U.S. Industries, Inc.; Terex

Corporation, individually and as parent company of American Crane; Pacific Bell Telephone

Company, doing business as AT&T California; Executone Communications Systems, LLC;

Nevada Bell Telephone Company, doing business as AT&T Nevada.

3.      On June 23, 2017, Defendant Crane Company removed the above named

case to Federal Jurisdiction.

4.      Subsequently, Defendants have filed Cross Claims along with their Answers

against all Defendants.

5.      On or about March 6, 2018, Thomas Gorton died from respiratory failure caused

by his mesothelioma.

6.      On or about June 22, 2018, Plaintiff Rhonda J. Gorton was appointed as Personal

Representative of the Estate of Thomas Dudley Gorton, II, by the Court in Flathead County,

Montana.

THE PARTIES

7.      Plaintiff Rhonda J. Gorton, is an adult individual residing at 117 Sunburst,

Kalispell, Montana 59901.

8.      Plaintiff  would also name as defendants the Johns-Manville Corporation, the

Johns Manville Sales Corporation, UNARCO, Amatex Corporation, Forty Eight Insulators

Incorporated, Wallace and Gale Company, Flintkote, Nicolet Industries, Pacor, Inc., Raymark

5

Industries Inc., Raymark Corporation and Raytech, DI Distributors Inc. f/k/a Delaware Insulation

Company, Inc., Carey Canada, Celotex Corporation, Eagle Picher Industries, Inc., Keene

Corporation, Rock Wool Manufacturing Co., H.K. Porter Company, Inc., Pittsburgh Corning

Corporation, Asbestos Claims Management Corporation f/k/a National Gypsum, GI Holdings,

Inc. f/k/a GAF Corporation, Congoleum Corporation, Owens Corning, Fibreboard Corporation,

Armstrong World Industries, Inc., W.R. Grace & Co. - Conn., United States Gypsum Company,

U.S. Mineral Products, T&N Plc., AC&S, Inc., Chrysler LLC, f/k/a Daimler Chrysler

Corporation, General Motors Corporation, Durabla Mfg. Company, Chesterton Manufacturing

Co., Garlock Incorporated, Garlock Sealing Technologies, The Anchor Packing Company, Leslie

Controls, Inc., Standco Industries, Inc. f/k/a Standard Brake Lining individually and as successor-

in-interest to Sterling Packing and Gasket Company, Inc., and Bondex International, Inc.; Kaiser

Gypsum Company, Inc.; A Best Company; A.P. Green Refractories Company; Dresser

Industries; Frazier-Simplex Inc.; Hanson Permanente Cement Inc.; Harbison-Walker

Refractories; Kaiser Aluminum & Chem Corp.; National Refractories; North American

Refractories Co.; Plibrico; Pittsburgh Corning Corp.; and Rapid American Corp. however, each

of these potential defendants has filed for relief or been forced into involuntary bankruptcy under

Chapter 11 of the Bankruptcy Code and, pursuant to 11 U.S.C. Section 362, the institution of

actions against these companies is stayed.  Plaintiff would have brought suit against the

companies enumerated in this paragraph but for the automatic stay.

9.      Defendants, at all times relevant hereto, were miners, manufacturers, processors,

importers, converters, compounders, merchants and / or suppliers of asbestos, insulation

materials and / or asbestos-containing products who acting by and through their servants, agents and employees, caused such asbestos products to be sold and placed in the stream of commerce. Plaintiff incorporates by reference all allegations in Plaintiff's Complaints filed in Dauphin County, Pennsylvania, docketed at 2012-CV-8651-AS and 2017-CV-3790-AS as though set forth in its complete text.

10.     This Amended Complaint involves the claims of the following persons: Plaintiff: Rhonda J. Gorton and Plaintiff's Decedent: Thomas D. Gorton, II.  Plaintiff as Personal Representative of the estate of the Decedent, is empowered to commence and prosecute this action as one which the Decedent could have commenced and prosecuted and to recover all damages recoverable by Plaintiff's Decedent, had he survived, and, in addition thereto, funeral and other incidental expenses as allowable by law.

11.     Plaintiff, Rhonda J. Gorton is the Personal Representative and was the spouse of Thomas D. Gorton, II., hereinafter referred to as Plaintiff's Decedent.

12.     Plaintiff, was granted Letters Testamentary by the Court of Flathead County for the State of Montana on or about June 22, 2018.

13.     Plaintiff brings this action on behalf of herself and the following persons who are entitled to recover damages in this action: Karri Gorton, Tamara Beauduy, Amanda Geiger, and Stephanie Gorton.

<u>ALLEGATIONS RELATING TO ALL DEFENDANTS</u>

14.     The defendants are those companies listed in the original Complaint and hereby named in this Amended Complaint.

7

15.     At all times relevant hereto, the defendant corporations acted through their duly authorized agents, servants, and employees, who were then in the course and scope of their employment and in furtherance of the business of said corporations and who caused asbestos products, and/or products requiring and/or incorporating the use of asbestos, to be sold and placed in the stream of commerce.

16.     Each of the Defendants was or is engaged in the business of manufacturing, and/or distributing, and/or constructing, and/or supplying or selling asbestos and asbestos-containing products, and/or products requiring and/or incorporating the use of asbestos, and/or other fibrogenic and carcinogenic materials and/or used products while Plaintiff was an employee and did own fully or partially, lease, manage, work upon and/or control various facilities where Plaintiff worked.

17.     Each of the Defendants, at pertinent times hereto, has, or is, transacting business in Pennsylvania.

18.     AT&T first registered to do business in Pennsylvania in 1912 and continues to be registered as a foreign corporation to this day.

19.     Pacific Bell Telephone Company first registered to do business in Pennsylvania in 1996 and continues to be registered as a foreign corporation to this day.

20.     Ford Motor Company first registered to do business in Pennsylvania in 1920 and continues to be registered as a foreign corporation to this day.  Further, Ford Motor Company owns property within the Commonwealth of Pennsylvania.

PLAINTIFF'S DECEDENT'S WORK HISTORY

8

21.     Plaintiff's Decedent was employed by various employers at various locations and at each location was exposed to the asbestos products of the defendants herein, he served in the United States Navy – and suffered injurious exposure to asbestos dust and fibers – at the following locations and dates:

a.     From April 1959 to June 1962 at the Hunter's Point Naval Shipyard, San Francisco, California; Long Beach Naval Shipyard, Long Beach, California; and aboard the USS Blue, DD-744.

b.     Through employment with Pacific Bell Telephone Company of St. Louis, Missouri, from approximately September 1962 to approximately July 1968 as a telephone service technician and repairman at commercial buildings in the Los Angeles, California area.

c.     Through employment with Aztec Communications Inc. of Palm Desert, California, from 1984 through 1985 as a telephone service technician and repairman at countless residential and commercial buildings in Los Angeles, California.

d.     Through employment with Executone-Akron, Inc. of Akron, Ohio, in 1985 as a telephone service technician and repairman at countless commercial buildings in the Akron, Ohio area.

e.     Through employment with Nevada Bell Telephone Company of St. Louis, Missouri, in 1978 and from 1986 through 1988 as a service technician and repairman at countless residential and commercial buildings in Carson City, Nevada, North Lake, Tahoe Nevada; and Reno, Nevada.

f.     Through employment with AT&T, Inc. of Ohio, from 1986 through 1988

9

as a service technician working throughout the AT&T, Inc. Columbus, Ohio location installing

telephone cable throughout the entire building.

        g.      Through employment with AT&T Communications Inc., of Ohio,

from 1986 through 1988 as a service technician working throughout the AT&T, Inc. Columbus,

Ohio location installing telephone cable throughout the entire building.

        h.      Through employment with Olson Brothers Service, Inc., as a mechanic in

Corvallis, OR in 1982;

        i.      Throughout his employment with the various phone companies, Mr.

Gorton was exposed to asbestos containing bags or pillows believed to be manufactured by

AT&T used to plug cable and telephone holes;

        j.      Throughout his lifetime, including while a resident of the Commonwealth

of Pennsylvania, through exposure to various products while building and renovating homes,

including his home located in Lemoyne, Pennsylvania;

        k.      Throughout his lifetime, including while a resident of the Commonwealth

of Pennsylvania, through exposure to automobiles and products, while maintaining his own

personal vehicles and the vehicles of various friends and family members.

        l.      Plaintiff's Decedent's exposure to asbestos and asbestos-containing

products and/or machinery requiring the use of asbestos and/or asbestos containing products for

which said defendants, and each of them, are responsible, occurred while working aboard,

inspecting, maintaining and repairing ships at various times starting in approximately April of

1959, and included but is not limited to work aboard the United States Navy Ship USS Blue.

22.     Plaintiff's Decedent  was exposed to various asbestos products including but not limited to, the following: blankets, pipe covering, block, drywall compound, gaskets, packing, rope, cement, radar equipment, pumps, boilers, turbines, brakes, motors, brakes on motors, asbestos bags or pillows used to plug cable and telephone holes, and other asbestos containing products.

23.     The air Plaintiff's Decedent breathed was contaminated with asbestos dust and fibers shed by asbestos products sold, manufactured or distributed by the defendant corporations and each of them during the period 1959 to the early 2000's while Plaintiff's Decedent was: household exposure through working on vehicles at home, and while employed by the various employers averred in paragraphs above.

NOTICE OF INJURIES

24.     Plaintiff's Decedent was first diagnosed with Mesothelioma in January 2017. This disease was solely and proximately caused by his exposure to and use of the asbestos products which were manufactured, sold and/or supplied by the above named defendant corporations.

25.     Plaintiff's Decedent died on or about March 6, 2018 as a direct result of his asbestos related Mesothelioma due to the inhalation of asbestos fibers manufactured and/or supplied by the defendants named herein.

COUNT ONE - PRODUCT LIABILITY

26.     Plaintiff incorporates by reference the allegations contained in all relevant paragraphs above and in Plaintiff's previously filed Complaints as if fully set forth herein.

11

27.     Defendant's, asbestos products were defective in design and /or construction in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos fibers which unreasonably endangered the life and health of the ultimate users thereof and of the persons in the position of Plaintiff's Decedent.  Defendants placed their asbestos products on the market knowing that they would be used without inspection for such defects.  Defendants, and each of them, had actual knowledge of the hazards associated with exposure to their asbestos-containing products, and had actual knowledge of their potential for harm.  Nevertheless, Defendants, and each of them, acted with conscious or deliberate disregard of the foreseeable harm resulting from that defect.  Additionally, Defendants, and each of them, willfully refused to know and failed to make reasonable inquiry with a conscious purpose to avoid learning the truth as to the hazards associated with exposure to the dust created in the use of their asbestos-containing products.

28.     The Defendants' asbestos products were defective in design and /or construction as alleged in the above paragraph and Defendants failed to provide warnings, adequate warnings, or instructions about the dangers, risks and harm inherent in their asbestos products.

29.     The Defendants's asbestos products were incapable of being made safe for their ordinary and intended use and purpose and Defendants failed to provide warnings, adequate warnings or instructions about the dangers, risks and harm inherent in their asbestos products.

30.     At the time each of the Defendants manufactured, sold, delivered and were otherwise in possession of the aforesaid asbestos products, such products were expected to, and did, reach Plaintiff's decedent in a condition without substantial change from that in which such

products were when within the possession of Defendants.

31.    Plaintiff's Decedent, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a technician/ mechanic/ shipmate, to Defendants' asbestos products.

32.    As a result of the  direct, proximate and frequent exposure as described above to Defendants' asbestos products, Plaintiff's Decedent developed and suffered from an asbestos related disease / mesothelioma and died on March 8, 2018.

33.    As a result of the further direct, frequent and proximate exposure to Defendants' products and the injuries described above, Plaintiff's Decedent suffered great physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation and lost the ability to enjoy life as he otherwise would if he had not suffered from an asbestos-related disease.  Plaintiff's Decedent required medical treatment and incurred great expenses for medical and hospital care and treatment.

WHEREFORE, Plaintiff demands judgment against all defendants named in this Complaint, and each of them, in an amount in excess of fifty thousand dollars ($50,000.00) for compensatory damages and in excess of fifty thousand dollars  ($50,000.00) for punitive damages, plus costs, attorney's fees and such further relief as may be appropriate.

## COUNT TWO - BREACH OF IMPLIED WARRANTY

34.    Plaintiff adopts and incorporates by reference all relevant paragraphs of this Complaint, and the Complaints filed in Dauphin County as if fully set forth herein.

13

35.     Defendants, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the particular use for which said products were intended.  The implied warranty was breached in that harmful, poisonous, deleterious and inherently dangerous asbestos dust and fibers were released into the air and atmosphere wherein Plaintiff's Decedent carried out his duties using said products.  As a result of frequent, direct and proximate exposure to Defendants' products and the breach of such warranty, Plaintiff's Decedent developed an asbestos-related disease, without negligence or want of due care on the part of Plaintiff's Decedent contributing thereto.

WHEREFORE, Plaintiff demands judgment against all defendants named in this Complaint, and each of them, in an amount in excess of fifty thousand dollars ($50,000.00) for compensatory damages and in excess of fifty thousand dollars  ($50,000.00) for punitive damages, plus costs, attorney's fees and such further relief as may be appropriate.

<u>COUNT THREE - NEGLIGENCE</u>

36.     Plaintiff adopts and incorporates by reference all relevant paragraphs of this Amended Complaint and the prior Complaints filed in Dauphin County as if fully set forth herein.

37.     Defendants, and each of them, knew, or in the exercise of reasonable care should have known, that persons in the position of the Plaintiff's Decedent would be required to and would, in fact come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary cared should have known, were health and life threatening.

14

38.     Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's Decedent's position, omitted and failed, among other things;

a.      To properly design and or construct their asbestos products in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered life and health;

b.      To advise Plaintiff's Decedent of the dangerous characteristics of their asbestos products;

c.      To provide Plaintiff's Decedent with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitory equipment, which could have been employed to protect Plaintiff's Decedent from the harmful exposure to their asbestos products;

d.      To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

e.      To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

f.      To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

g.      To develop and distribute asbestos- free products.

15

39.     As a result of the proximate, frequent negligence, recklessness and gross indifference of the Defendants on a daily basis Plaintiff's Decedent developed ans asbestos - related disease and died on March 8, 2018 as the result of his exposure to the Defendants' asbestos products, without negligence or want of due care on the part of Plaintiff's Decedent contributing thereto.

WHEREFORE, Plaintiff demands judgment against all defendants named in this Complaint, and each of them, in an amount in excess of fifty thousand dollars ($50,000.00) for compensatory damages and in excess of fifty thousand dollars  ($50,000.00) for punitive damages, plus costs, attorney's fees and such further relief as may be appropriate.

COUNT FOUR - INTENTIONAL CONDUCT FRAUDULENT CONCEALMENT

40.     Plaintiff adopts and incorporates by reference all relevant paragraphs of this Amended Complaint and the Complaints previously filed in Dauphin County as if fully set forth herein.

31.     At all Times relevant hereto, each and every Defendant aided, assisted and encouraged the distribution and the sale of their products, including those complained of herein, without adequate warnings, other safety precautions or change in design, by the participation in, support of and the utilization of industry-wide and/ or parallel product research and development, exchanges of information, marketing, advertising, promotion and / or other similar endeavors, all of which such effort inured to the joint and mutual benefit of all such suppliers in the wide and continued distribution, sale and use of Defendants' products.

42.     Since a time prior to exposure of the Plaintiff's Decedent to the Defendants'

16

asbestos products, Defendants, and each of them, have been possessed with substantial medical

and scientific data by which these Defendants clearly knew that their asbestos products were, or

were likely to become, hazardous to the life, health and safety of persons in the position of

Plaintiff's Decedent who was exposed to their products. The aforementioned medical and

scientific data includes a vast list of articles and other documents which established that by 1935

asbestosis was widely recognized as a mortal threat affecting a large fraction of those persons

who had regularly worked with asbestos and asbestos products.

      a.     The aforementioned articles and documents include more than 80 reports printed

prior to 1935 in various medical and industry publications.  A true and correct list of these

articles can be found on pages 40 through 47 of the book entitled "Asbestos: Medical and Legal

Aspects" by Barry I. Castleman, Fourth Edition published by Aspen Law & Business, copyright

1996.

      b.     In addition, the aforementioned articles and documents include more than 100

publications between 1938 and the mid-1950's linking exposure to asbestos with cancer.  A true

and correct list of these articles and documents can be found on pages 137 through 158 of the

aforementioned book by Barry I. Castleman.

      c.     Defendants, and each of them, became aware, prior to Plaintiff's exposure to their

asbestos products, of a substantial number of these articles and documents and the information

and knowledge contained in them.

      43.     Nevertheless, prompted by pecuniary motives, each of the Defendants individually

and collectively, failed and refused to act upon such medical and scientific data, to warn users of

their products and those who worked in close proximity thereto of the life and health-threatening

dangers of exposure to and the breathing of asbestos fibers and dust, and to take such other

reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous

characteristics of their asbestos products upon Plaintiff's Decedent. Defendants, in wanton and

reckless disregard for human life and health, deliberately, intentionally and purposely with held

and concealed such information from users of and those exposed to their products including

Plaintiff's Decedent.

44.      Plaintiff's Decedent, unaware of the dangers to life and health resulting from

exposure to Defendants' asbestos products and not possessing the degree of technical knowledge

and expertise of the Defendants concerning asbestos and its use, continued to work with and

around their products and was deprived by the above described acts and omissions of the

Defendants of the free and informed opportunity to remove himself from exposure to

Defendants' asbestos products and otherwise to protect himself from exposure thereto. The

Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's

Decedent's Asbestos related disease and related damages.

WHEREFORE, Plaintiff demands judgment against all defendants named in this

Complaint, and each of them, in an amount in excess of fifty thousand dollars ($50,000.00) for

compensatory damages and in excess of fifty thousand dollars ($50,000.00) for punitive

damages, plus costs, attorney's fees and such further relief as may be appropriate

<u>COUNT FIVE - PREMISES LIABILITY</u>

45.      Plaintiff repeats, reiterates and realleges each and every allegation contained in the

18

above mentioned  paragraphs with the same force and effect as if hereinafter set forth at length.

46.     These counts are brought by Plaintiff against Defendants AT&T, Pacific Bell

Telephone Company, Aztec Communications, Inc., Executone Communications Systems, LLC.,

and Nevada Bell and is brought in addition to the allegations contained in the Complaints

previously filed in Dauphin County, which are incorporated herein by reference as though set

forth in their complete text.

47.     On numerous occasions and for substantial periods of time Plaintiff's Decedent

worked as a telephone installer and repairman and technician at various facilities throughout the

country including, California, Montana, Nevada, Oregon and Ohio and was therefore invited onto

and lawfully entered upon property owned and controlled by the phone companies as an

employee.  Plaintiff's Decedent had been specifically requested to perform work and services for

the benefit and aid of said defendants as a Repair Technician from 1962 through 1988.

Specifically, from 1986 through 1988, Plaintiff's Decedent worked in a building owned by

AT&T in Columbus, Ohio performing various repair work to the cables and telephone lines

throughout the building and was exposed to asbestos containing bags and pillows that were used

to plug cable holes throughout the building, among other products.

48.     The phone companies, including but not limited to, AT&T  owed a duty to

Thomas D. Gorton, II.,  to use due care to maintain their property free of unreasonably dangerous

and defective conditions and to adequately warn Plaintiff's Decedent of existing dangerous and

defective conditions on the premises.

49.     While upon property owned and controlled by the telephone companies, including

but not limited to AT&T, as an employee, Thomas D. Gorton, II. was exposed to, large

quantities of asbestos-containing products.

50.     At all times complained of herein, AT&T and the other telephone companies

knew or should have known large quantities of asbestos-containing products were present upon

their premises including equipment and products with which Plaintiff's Decedent was

specifically working.

51.     At all times complained of herein, AT&T and the other phone companies, knew

or should have known the asbestos-containing products released dangerous levels of airborne

asbestos fibers during application, deterioration and removal.

52.     At all times complained of herein, AT&T and the other phone companies knew or

should have known their employee Thomas D. Gorton, II., would necessarily work with, around,

or in close proximity to these asbestos-containing products while they were being applied,

removed or in the process of deteriorating and would therefore breathe these asbestos fibers. This

exposure to Plaintiff's Decedent occurring from 1962 to 1988, including but not limited to,

exposure in Columbus, Ohio while employed for Defendant AT&T from 1986 to 1988.

53.     At all times complained of herein, AT&T and the other telephone companies

knew or should have known the inhalation of asbestos fibers could cause pleural disease,

asbestosis, lung carcinoma, malignant mesothelioma, carcinoma of the gastrointestinal tract, and

other malignant and non-malignant diseases.

54.     At all times complained of herein, AT&T and the other telephone companies

knew or should have known Thomas D. Gorton, II., was unaware of the dangers associated with

asbestos exposure, or the full magnitude of that danger, and therefore was not capable of taking

adequate measures to protect himself and his health and welfare.

55.     At all times complained of herein, AT&T and the other telephone companies

failed to otherwise exercise control as owners of their property in a manner calculated to

maintain their premises free of asbestos, an unnecessarily dangerous and defective condition, and

thereby protect the health of their employees and their families.

56.     At all times complained of herein, AT&T and the other telephone companies

failed to remove and contain the asbestos materials so as to render the premises safe.

57.     At all times complained of herein, AT&T and the other telephone companies

failed to cease and discontinue further installation of asbestos-containing products on their

premises and failed to cease and discontinue their employees from working upon and with the

asbestos-containing products, including but not limited to radar equipment.

58.     AT&T and the other telephone companies knew or should have known of the

conditions set forth in the paragraphs above and at all times complained of herein were in a

superior position to that of their employees and Plaintiff's Decedent to know the dangers of

asbestos.  AT&T and the other telephone companies were negligent in their failure to warn their

employees and other persons similarly situated of the dangerous and defective condition of the

premises brought by the presence of asbestos.

59.     The actions or omissions of AT&T and the other telephone companies set forth in

the paragraphs above of this Complaint were the cause of or were a significant contributing

factor in bringing about the physical injuries set forth in above of this complaint and all damages

suffered by Plaintiff's Decedent resulting from these physical injuries.

WHEREFORE, in addition to, or in the alternative to the relief requested in all the previously plead counts, Plaintiff demands judgment against AT&T, the other telephone companies, and each and every other defendant named in this Complaint in an amount in excess of Fifty Thousand Dollars ($50,000.00) for compensatory damages and Fifty Thousand Dollars ($50,000.00) for punitive damages, plus costs, attorney's fees and such further relief as may be appropriate.

## COUNT SIX - CONSPIRACY

60.     Plaintiff adopts and incorporates by reference all relevant paragraphs that are appropriate of this Amended Complaint, and previously filed Complaints in Dauphin County as if fully set forth herein.

61.     Defendants formed confederacies as hereinafter described and entered into agreements or tacit understandings to individually, jointly and in conspiracy with each other market asbestos products by unlawful means, including inter  alia, their tortious conduct of suppressing their knowledge of the dangers of asbestos and of placing into the stream of commerce, without adequate testing or warnings, their asbestos products, which were unreasonably dangerous, ultra hazardous, deleterious, carcinogenic and potentially deadly.

62.     Defendants, individually, jointly and in conspiracy with each other knowingly committed the tortious and contractual acts described in this Complaint, as well as other similar wrongs, in furtherance of their agreement or understanding to market asbestos products in an unlawful manner.

a.     As for Defendants A C and S, Inc., Armstrong World Industries, Inc.,

Asbestospray Corporation, Carey Canada, Inc., The Celotex Corporation, Eagle Picher Industries,

Inc., Fibreboard Corporation, GAF Corporation, Georgia Pacific Corporation, H.K. Porter

Company, Inc., Johns-Manville Corporation, (whose liabilities have been assumed by the

Manville Corporation Asbestos Disease Compensation Fund), Keene Corporation, Metropolitan

Life Insurance Company, National Gypsum Company, Owens-Corning Fiberglas Corp., Owens-

Illinois Glass Co., Pittsburgh Corning Corporation, The Ruberoid Company, Smith & Kanzler

Corporation, Southern Textile Corporation, Turner & Newall, plc., United States Gypsum Co.,

and U.S. Minerals Products Company, Plaintiffs allege that the Defendants knew beginning in

the early 1930's of the extreme dangers to those who were exposed to asbestos dust and fibers

and that this knowledge continued into the 1940's, 1950's and 1960's and later.  Instead of

warning representatives and other similar workers about the dangerous nature of their asbestos

and asbestos products, the Defendants conspired with each other to hide the dangers, hide all

information about the dangers, and indeed to keep workers and others ignorant or at least

unknowing about the dangers of asbestos.

b.     Plaintiffs allege and will prove that the Defendants, hereinafter sometimes

referred to as "conspirators" or "conspiring Defendants" conspired amongst themselves and with

other manufacturers, some of whom may presently be in bankruptcy, and distributors to injure

the Plaintiffs in the following fashion:

c.     In 1928, the Eagle Picher Lead Co. through its General Manager, George

Potter, became associated with the Tri-State Operators Clinic at Picher, Oklahoma.  This clinic

23

was run jointly by co-conspirator Metropolitan Life Insurance Company and others. Dr. Sayers

of the U.S. Bureau of Mines and Dr. Anthony J. Lanza, employee and/or agent of the

Metropolitan Life Insurance Company were physicians associate with the clinic. Throughout

1930 and thereafter, the Eagle Picher Lead Co. remained associated with the clinic. On May 23,

1930, Dr. F. V. Meriwether another physician associated with the clinic informed Dr. Anthony J.

Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company that Mr. O.N.

Wampler, Safety Director of the Eagle Picher Lead Company expressed concern over Eagle

Picher Lead Co.'s lack of supervision of manpower which ultimately permitted industrial diseases

to become part of the compensation laws. Mr. Wampler expressed particular concern over

asbestos legislation. Eagle Picher, by and through its agents, servants and/or employees with its

co-conspirators intentionally failed to warn workers and others of the dangers of exposure to

asbestos which it and others possessed at that time.

       d.     In 1930, Metropolitan Life Insurance Company, through its agent Dr.

Anthony J. Lanza along with Dr. Frank Pedley conducted a study of 195 Quebec asbestos miners.

Forty-two cases of asbestosis were identified among the 195 men examined, but the results were

never published in medical literature. In 1939, Dr. Anthony J. Lanza published an article in the

American Review of Tuberculosis, Industrial Dusts and the Morality from Pulmonary Disease, in

which he stated that the asbestos cases described therein originated in textile and other asbestos

fabricating plants and not in connection with asbestos mining.

       e.     In 1933, Metropolitan Life Insurance Company, insurer of co-conspirator

Johns-Manville Company, through its agent Dr. Anthony J. Lanza, advised physicians at the

Johns-Manville, Waaukegan, Illinois plant that it was doubtful whether the asbestos hazard was

sufficient to justify warning posters that asbestos was hazardous to health.  According to Dr.

Lanza this was especially true in light of the extraordinary legal situation.

        f.      In the early 1930's several asbestos manufacturers were subjected to

compensation suits by individuals employed in their factories and mills.  These suits provoked

Defendant Johns-Manville and now bankrupt co-conspirator Raymark Industries, Inc.

(Raybestos-Manhattan, Inc.) to conduct research into the effects of asbestos on human beings and

animals.  Numerous studies of experimental and statistical nature were conducted by various co-

conspirators and were either never published in the medical literature, as previously alleged or

which when published, were subjected to substantive editing by members of the conspiracy.

        g.      Beginning in approximately 1934, Johns-Manville Corporation, through

its agents, Vandiver Brown and attorney J.C. Hobart, and co-conspirator Raybestos-Manhattan,

through its agents, Sumner Simpson and J. D. Rohrbach, suggested to Dr. Anthony Lanza,

Associate Director of co-conspirator, Metropolitan Life Insurance Company (insurers of

Manville and Raybestos) that Dr. Lanza edit a previously completed study on asbestos and

publish a study which would affirmatively misrepresent a material fact about asbestos exposure;

that is, the seriousness of the disease process, asbestosis.  This was accomplished through

intentional deletion of Lanza' description of asbestosis as "fatal"; and through other selective

editing that affirmatively misrepresented asbestosis as a disease process less serious than it

actually is and was known to be.  As a result, Dr. Lanza's study was published in the medical

literature in this misleading fashion in 1935 in the United States Public Health Service Reports.

25

The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville and Raybestos.

   h.  In 1934, F.W. Sherwood, Vice President of Owens-Illinois and Roger Hitchins presented a request to the Mellon Institute of Industrial Research from various manufacturers that the Mellon Institute sponsor a symposium on industrial disease problems. In December of 1934, Dr. E.R. Werdlein, Director of the Mellon Institute of Industrial Research, wrote a letter to, among others, Metropolitan Life Insurance Company and Johns-Manville outlining various types of dust diseases known generally as pneumoconiosis and including asbestosis. Following this letter a symposium of dust problems was held on January 15, 1935 in Pittsburgh, Pennsylvania. Among those present were Vandiver Brown of Johns-Manville, A.J. Lanza, Metropolitan Life Insurance Company and A.C. Hirth, an attorney for Owens-Illinois Glass Company. In January of 1935, Vandiver Brown wrote "An impressive list of experts" specializing in various aspects of the dust problem attended the meeting and delivered addresses which "together with open discussion following them" revealed:

   ...The very menacing character of the problem, its complex nature, the uncertainties attending most of this aspects and the necessity of some form of united action by the afflicted industries.

   Participants in the symposium discussed the problems related to (1) obtaining expert testimony; (2) jury verdicts; (3) "[p]roblems of ventilation, dust collecting and elimination, and respiratory devices" and (4) "establishing of standards (a) for dust counting and

particle size determination, (b) for the taking of x-rays and diagnostic use, and © for the interpretation of the markings on the films so produced."

I.      At the conclusion of the symposium a committee was elected for the purpose of "formulation of ways and means to bring about effective cooperation of some character between the various industries for meeting and combating those phases of the dust problem common to all." A.W. Sherwood from Owens-Illinois and Vandiver Brown from Johns-Manville were elected to various committees. Dr. Lanza of Metropolitan Life Insurance was a central figure in the formation of what became known as the Industrial Hygiene Foundation and also became Chairman of the Medical Committee of the Foundation. The Industrial Hygiene Foundation performed confidential industrial and medical surveys for the Asbestos Textile Institute, as hereinafter alleged, and also performed an epidemiological study of lung cancer in asbestos mines for the Quebec Asbestos Mining Association and ultimately altered the final report to delete substantive data on the prevalence of lung cancer in asbestos miners, all as hereinafter alleged.

j.      In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newell), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, United States Gypsum, the Thermoid Company and Southern Asbestos Company (whose liabilities have been assumed by H.K. Porter Company) entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the

power to decide what information Saranac Laboratories could publish about asbestos disease and

control in what form such publications were to occur.  This agreement gave these conspirators

power to affirmatively misrepresent the results of the work at Saranac, and also gave these

conspirators power to suppress material facts included in any study.  On numerous occasions

thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing

material scientific data, resulting in numerous misstatements of fact being made at scientific

meetings.

        k.       As a result of the foregoing Saranac Studies Dr. Leroy Gardner, in 1943,

prepared a monograph on human asbestosis which suggested evidence that asbestosis may

precipitate the development of lung cancer.  On October 24, 1946, Dr. Leroy Gardner, the

primary scientist and researcher in charge of the Saranac Laboratory studies unexpectedly died.

        l.       In 1946, Dr. Anthony Lanza was elected to the Board of Trustees of the

Saranac Laboratory, Trudeau Foundation but maintained his position as Medical Director for

Metropolitan Life Insurance Company.  Thereafter, on numerous occasions signatories of the

1936 agreement began to enlist the services of Dr. Lanza to have an edited report of Dr.

Gardner's studies published.

        m.      On January 21, 1947, Dr. Lanza met with executives of one of the co-

conspirators Johns-Manville to devise a plan to have Dr. Gardner's Saranac studies published.

During the meeting Vandiver Brown called attention to the editorial control of the asbestos

company sponsors over any publication and of the importance of not including any objectionable

material from the conspirators point of view such as the relationship between asbestos dust and cancer which Dr. Gardner had made in his monograph or outline on humans asbestosis.

n.      On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation; American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union asbestos and Rubber Company and United States Gypsum.  U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

o.      At this November 11, 1948 meeting, these co-conspirators and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical view of the then-existing standards of dust exposure for asbestos and asbestos products.

p.      At this meeting, these co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Arthur Vorwald.  These Defendants thereby fraudulently misrepresented the risks of asbestos

29

exposure to the public in general and the class of persons exposed to asbestos, including the Plaintiffs.

   q. As a result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of risks.  The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication the university libraries, government officials, agencies and others.

   r. Such action constituted a material affirmative misrepresentation of the total content of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem then Dr. Gardner's unedited work indicated.

   s. The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey Canada, Inc., Philip Carey Company (whose liabilities have been assumed by Celotex), National Gypsum Company, Turner & Newall, and H.K. Porter Company.  These conspirators, members of the Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardener published by Arthur Vorwald in the AMA Archives of Industrial Health in 19551. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from coconspirators dated:

30

10/29/47 from A. R. Fisher to J. P. Woodard

11/26/47 from J. P. Woodard to Vandiver Brown

03/06/48 from George K. Foster to J. P. Woodard

10/15/48 from J. P. Woodard to Vandiver Brown

03/08/49 from Vandiver Brown to Ivan Sabourin

03/21/51 from Vandiver Brown to Ivan Sabourin

09/06/50 from J. P. Woodard to G. K. Foster, and all indicating close monitoring

of the editing process by Q.A.M.A's representative, Ivan Sabourin, acting on behalf of all

Q.A.M.A.'s members.

      t.     Defendants who were members of the Q.A.M.A. as described above,

began on or about 1950 to formulate a plan to influence public opinion about the relationship

between asbestos and cancer by influencing the medical literature on this subject and then touting

and disseminating this literature to the public and to organizations and legislative bodies

responsible for regulatory control of asbestos with the specific intent of misrepresenting the

existing scientific information and suppressing contrary scientific data in their possession and

control.

      u.     This plan of misrepresentation and influence over the medical literature

began in or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary

report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might

31

exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

v.     As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including Plaintiffs.

w.     Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braum to further study the relationship between asbestos exposure, asbestosis and lung cancer.  In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a workers' chances of incurring lung cancer.

x.     The Q.A.M.A. defendant conspirators/members there-after caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A.  The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

y.      By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

z.      In approximately 1958, the Q.A.M.A. defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

aa.     The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of 1958 Braun/Truan study influenced the standards set for threshold limit values and prevented the lowering of the threshold limit value because of cancer risk associated with asbestos inhalation.

bb.     In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

cc.     The following conspirators were members of the Magnesia Insulation Manufacturers Association which later changed its name to the National Insulation Manufacturers Association (NIMA):  Philip-Carey Corporation (whose assets and liabilities have been assumed by Celotex), Johns-Manville, GAF Corporation, The Ruberoid Company, Owens-Corning Fiberglas, Eagle Picher Industries, Inc., Pittsburgh Corning Corporation, Fiberboard Corporation and Keene Corporation.

33

dd.     In 1955, these conspirators caused to be published the MIMA 85%

Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-

containing products were easily cut and fit and offered no hazard to workers who used these

products.

ee.     In May, 1968 John Vyverberg of Owens-Corning Fiberglas, along with

Cliff Sheckler of Johns-Manville addressed a Southwestern Insulation Contractors Association

(SWICA) meeting concerning asbestos related health hazards.  Pittsburgh Corning's R.E. Fuhs

reported on that meeting in a 5/28/68 memorandum to R.E. Buckley and stated:

During the recent SWICA meeting in Biloxi, Mississippi, a great deal of time was

spent discussing the health hazards imposed on workers through the use of asbestos in high

temperature insulation.

A program was presented by NIMA with Cliff Sheckler of Johns-Manville and

John Vyverberg of Owens-Corning bringing the group in attendance up-to-date on the problem

and what NIMA is doing to counteract some very adverse activity at the present time.

It appears, Bob that the problem of health hazards amongst asbestos workers is

rapidly becoming critical (30% of current asbestos workers have pulmonary problems) and that a

strong united front is necessary to preserve this industry.  In my opinion, NIMA is doing an

excellent job of spotlighting this problem and through research and discreet publicity are

probably our best hope of combating this very serious situation.

In 1968, NIMA published a brochure entitled, "Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos," which fails to mention asbestosis, lung cancer or mesothelioma.  It states, by way of introduction,

The modern mass production of hundreds of natural and synthetic materials such as asbestos, has brought the need to protect workers from certain health risks, known or suspected.

This vague reference to "certain health risks" clearly misleads the public including the Plaintiffs by not calling attention to the well-established link between asbestos exposure and asbestosis, lung cancer and mesothelioma.  The co-conspirators through their active participation in NIMA, acted in concert with the other NIMA members to distort, suppress and misrepresent information relating to health hazards associated with asbestos.

The following conspirators, among others, were members of the trade organization known as the Asbestos Textile Institute (ATI):   Raybestos-Manhattan, Johns-Manville, Southern Asbestos Company/H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall and National Gypsum Company.

ff.      In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis, which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable.  Thereafter, these defendant conspirators

withheld additional material information on the dust standards from the American Conference of

Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of

threshold limit values for asbestos exposure.

gg.     In 1953, conspirator National Gypsum, through its agents, in response to

an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos

spray products, refused to mail a proposed response to that division indicating that respirators

should be worn by applicators of the product.  National Gypsum's response distorted and

fraudulently misrepresented the need for applicators of asbestos spray products to wear

respirators and fraudulently concealed from such applicators the need for respirators.

hh.     In 1955, conspirator Johns-Manville, through its agent Kenneth Smith,

caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary

Disability in Asbestos Workers".  This published study materially altered the results of an earlier

study in 1949 concerning the same set of workers.  This alteration of Dr. Smith's study

constituted a fraudulent and material misrepresentation about the extent of the risk associated

with asbestos inhalation.

ii.     In 1955, the National Cancer Institute held a meeting at which conspirator

Johns-Manville, individually and as an agent for other alleged co-conspirators, affirmatively

misrepresented that there were no existing animal studies concerning the relationship between

asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several

studies which demonstrated that positive evidence did exist.

jj.     In 1957, the aforementioned conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

kk.     In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irvin J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ll.     In 1970, through their agents, Defendants, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

mm.    All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above, acted as agents and conspirators for the other conspirators.

nn.     The acts of the Defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

37

(a)     The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)     Defendants individually, as member of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)     maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)     assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3)     influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4)     to provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)     Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products, and continued their exposure to asbestos because they believed it to be safe.

(d)     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended Plaintiffs to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and

38

scientific data regarding the hazards of asbestos and asbestos-related products, and to continue their exposure to those products.

(e)     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

(f)     Plaintiffs suffered injury as a direct and proximate result of the acts alleged herein.

oo.     On October 28, 1938, Owens-Illinois and Corning Glass Works entered into an agreement for the formation of Owens-Corning Fiberglas Corporation. When Owens-Corning Fiberglas was incorporated in 1938 it had an interlocking Board of Directors consisting of seven members, three of whom were designated by Owens-Illinois and three of whom were designated by Corning Glass Works. The seventh member was Harold Boeschenstein who was President of Owens-Corning Fiberglas Corporation since its inception in 1938 and was also on the Board of Directors of Owens-Illinois.

pp.     As early as March 9, 1937, W.C. Templer, M.D., medical director of Corning Glass Works, one of the parent companies of Owens-Corning Fiberglas Corporation, was aware that asbestos was capable of producing fibrosis of the lung.

qq.    Additionally, as early as 1941, representatives of Owens-Corning Fiberglas Corporation and Owens-Illinois, Inc. shared information concerning the hazards of asbestos exposure.

rr.    Despite this knowledge, Owens-Illinois entered into an agreement with Owens-Corning Fiberglas whereby Owens-Corning Fiberglas Corporation became the national distributor of Kaylo products from 1953 to 1958, at which time Owens-Illinois sold the Kaylo product line to Owens-Corning.  At least in 1956, Owens-Illinois placed the Owens-Corning Fiberglas logo on some boxes of Kaylo, all of which were sold, then and thereafter without any warnings concerning the dangers of exposure to asbestos-containing products.

ss.    A C and S, Inc. began operating in 1958 under the name Armstrong Contracting and Supply Corporation.  It was a wholly owned subsidiary of the Armstrong Cork Company, now known as Armstrong World Industries.  A C and S, Inc. conspired with the makers of the products and by failing to recommend nonasbestos products and by failing to warn handlers and users of the hazards of asbestos.  A C and S, Inc. and these manufacturers used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products such as the Plaintiffs.  A C and S, Inc. not only failed to warn of the dangers despite its knowledge, but also failed to transmit any warnings its suppliers may have provided.

tt.    A C and S, Inc. particularly conspired with Turner & Newall which exercised great control over the sales and application of Limpet, an asbestos-containing spray product.  Turner & Newall shared its longstanding knowledge of the hazards of asbestos with

A C and S, Inc.  A C and S, Inc. joined Turner & Newall in failing to warn users of Limpet of the dangers and in suppressing Turner & Newall's substantial and specific knowledge of the hazards of asbestos.

uu.     A C and S, Inc., furthermore, cooperated with its insurance companies and other insurance companies by settling claims by workmen for injury due to asbestos exposure, thereby preventing public knowledge of the claims and hazards.

vv.     Armstrong World Industries conspired with the makers of the products it relabeled and distributed by failing to recommend non-asbestos products and by failing to warn ultimate building users of the hazards of asbestos.  Armstrong World Industries and these manufacturers, which included Baldwin-Ehret-Hill (Keene), Eagle Picher, Keasbey & Mattison (Turner & Newall and/or Nicolet) used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products, including the Plaintiffs.  Armstrong not only failed to warn of the dangers despite its knowledge, it also failed to transmit any warnings these other manufacturers provided to Armstrong.

ww.     Armstrong Cork (now Armstrong World Industries), in concert with Armstrong Contracting and Supply Corp., joined forces to suppress information about the asbestos hazards that had overcome their mutual workforce.  Armstrong Cork, Armstrong Contracting and Supply Co., (now A C and S, Inc.) and their insurance carriers suppressed information by making cash settlements to workers who submitted compensation claims.

xx.     In November, 1961, Smith and Kanzler and Asbestospray joined forces with Columbia Acoustics and Fireproofing Company, (now U.S. Minerals Products Corp.) and

others to organize a trade association to promote the use of asbestos-containing sprayed fiber products.

yy.     In October, 1965, Baldwin-Ehret-Hill (now Keene) joined the aforementioned group of asbestos spray fireproofing manufacturers comprised of Defendant U.S. Mineral Products Company, Asbestospray Corporation and Smith & Kanzler Company.  The group was called the Spray Mineral Fibers Manufacturers' Association (SMFMA).  The purpose of this organization was to promote the use of the members' asbestos spray products by representing those products to be safe and suitable for use as fireproofing and thermal insulation (contrary to the specific knowledge of the members that asbestos was dangerous).  The group sponsored secret asbestos dust tests of the members' products which proved Keene's products to be unreasonably and uncontrollably dusty.  The result of the secret asbestos dust studies were shared among the group but were suppressed from the general public as well as from the users, installers and consumers of those products.

zz.     From its creation, SMFMA was represented actively by counsel who was present at all meetings and wrote or reviewed all minutes for the express purpose of defending against subsequent allegations of conspiratorial activity by the members.  Subsequent correspondence revealed:

Having had some said experience with antitrust investigation and some with trade associations, I think if you are serious about the organization of such an association, it might be highly advisable to have an attorney on hand even at this first meeting, lest everybody get accused later of conspiracy, "phases of the moon," etc.

aaa.    As the popular press began to regularly publish medical findings in 1965

which established the unquestionable link between asbestos and cancer, Baldwin-Ehret-Hill

(Keene) worked with the other members of SMFMA to try to suppress and minimize public

recognition of the hazards posed by spray asbestos products in buildings.

bbb.    Moreover, the group acted in express unanimity to discredit and

undermine manufacturers who made spray mineral fiber products which did not contain asbestos.

The group further acted in concert to suppress information published by non-asbestos spray

mineral fiber manufacturers that would alert the public to the inherent dangers of asbestos spray

products due to foreseeable dusting, flaking and cracking.

ccc.    Along with the Celotex Corporation, Georgia Pacific Corporation,

National Gypsum Company and others, U.S. Gypsum was a member of a trade association called

the Gypsum Association.

ddd.    As recently as 1970, Defendant U.S. Gypsum demonstrated its tacit agreement

with other Defendant and non-defendant members of the asbestos industry to keep silent on the health

hazards of asbestos.  U.S. Gypsum understood that its decision to put an asbestos warning on any of its

products was a decision that had to be made by the entire industry or be subject to competitive

disadvantages because each company, including U.S. Gypsum, knew that consumers would not purchase

their products if they were made aware of the hazards of their asbestos content.

eee.    The acts of the Defendant conspirators, as described above, constitute a

fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

(a)    The material published or caused to be published by the Defendants was

false and incomplete in that the Defendants knowingly failed to advise the general public including the

Plaintiffs of the known health hazards of asbestos and asbestos-related products.

(b)     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)     maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)     assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3)     influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4)     to provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)     Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue their exposure to asbestos because they believed it to be safe.

(d)     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that Plaintiffs rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products.

(e)     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and

44

therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants

regarding the health hazards of asbestos and the absence of published medical and scientific data

regarding the hazards of asbestos and asbestos-related products.

(f)     Plaintiffs suffered injury as a direct and proximate result of the acts

alleged herein.

63.     Defendants' conspiracy and conduct in furtherance thereof were a direct and proximate

cause of Plaintiff's Decedent's asbestos-related diseases.

64.     WHEREFORE, Plaintiffs demand judgment against each Defendant in an amount in

excess of Fifty Thousand Dollars ($50,000.00) for compensatory damages and in excess of Fifty

Thousand Dollars ($50,000.00) for punitive damages, plus costs, interest, attorneys' fees, and such

further relief as may be appropriate.

<u>COUNT SEVEN - LOSS OF CONSORTIUM</u>

65.     Plaintiff the surviving spouse of Thomas D. Gorton, II., adopts and incorporates by

reference all relevant paragraphs of this Complaint as if fully set forth herein.

66.     Thomas D. Gorton, II., and Rhonda J. Gorton were married to each other at the time of

Thomas Gorton's death.

67.     Plaintiff and Plaintiff's Decedent had suffered a loss of consortium to the

detriment of their marital relationship, which loss and detriment were a proximate consequence of the

aforementioned acts, omissions, failures, and breaches of warranty, duty and law by Defendants.

WHEREFORE, in addition to, or in the alternative to the relief requested in all the previously

plead counts, Plaintiff demands judgment against each and every defendant named in this Amended

Complaint in an amount in excess of Fifty Thousand Dollars ($50,000.00) for compensatory damages

and Fifty Thousand Dollars ($50,000.00) for punitive damages, plus costs, attorney's fees and such

further relief as may be appropriate.

JURY TRIAL DEMANDED

Plaintiff elects to have her trial by Jury.


Respectfully Submitted,
**LAW OFFICES OF PETER G. ANGELOS, P.C.**

Dated:7/9/18                          By:*/s Jason B. Duncan*____
                                     Jason B. Duncan, Esquire
                                     PA ID# 87946
                                     Law Offices of Peter G. Angelos
                                     2001 N. Front St.
                                     Bldg. 3, Suite 330
                                     Harrisburg, PA 17102
                                     Phone: 717-232-1886
                                     Fax: 717-232-4189
                                     Email: Jduncan@lawpga.com
                                     Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | No.: 1:17-CV-01110-JFC |
| | : | |
| RHONDA J. GORTON, Personal Representative | : | <u>ASBESTOS CASE</u> |
| for the Estate of THOMAS D. GORTON, II, | : | |
| and in her own right, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AIR & LIQUID SYSTEMS | : | |
| CORPORATION, as Successor-by- | : | |
| Merger to Buffalo Pumps, Inc., et al., | : | |
| | : | |
| Defendants. | : | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have, this date, served the Amended Complaint, through filing the

foregoing with the Clerk of Court through the CM/ECF system which will automatically send electronic

mail notification of such filing to the CM/ECF registered participants as identified on the Electronic Mail

Notice.

**LAW OFFICES OF PETER G. ANGELOS, P.C.**

Dated: 7/9/18          By:     */s Jason B. Duncan__*
                                Jason B. Duncan, Esquire
                                PA ID# 87946
                                Law Offices of Peter G. Angelos, P.C.
                                2001 N. Front St.
                                Bldg. 3, Suite 330
                                Harrisburg, PA 17102
                                Phone: 717-232-1886
                                Fax: 717-232-4189
                                Email: jduncan@lawpga.com
                                Attorney for Plaintiff

47