## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RHONDA J. GORTON,** Personal Representative for the Estate of **THOMAS D. GORTON, II**, and in her own right, | ) ) ) ) | Civ. Action No.  1:17-1110 |
| Plaintiff, | ) | |
| v. | ) ) | |
| **Eaton Corporation, et al.**, | ) ) | |
| Defendants. | ) ) ) ) | |

## OPINION

### I.    Introduction

Decedent Thomas Gorton ("Mr. Gorton"), the husband of plaintiff Rhonda J. Gorton ("Mrs. Gorton"), developed mesothelioma, allegedly due to his occupational exposure to the asbestos-containing products manufactured by, among others, defendant Eaton Corporation ("Eaton") which is a successor-in-interest to Cutler-Hammer Inc. ("Cutler-Hammer").[1] Mrs. Gorton brought this lawsuit, which was removed to this court, on behalf of Mr. Gorton's estate and in her own right. Mrs. Gorton reached settlement agreements with many of the defendants in the litigation.

Currently pending before the court is a motion for summary judgment (ECF No. 567) filed by Eaton in which Eaton argues, among other things, that summary judgment should be granted in its favor because the evidence of record is insufficient for a reasonable jury to find

---

[1]     Because Eaton is the successor to Cutler-Hammer, references in this opinion to Cutler-Hammer are references to Eaton.

that Mr. Gorton ever worked with or around an asbestos-containing product attributable to Cutler-Hammer. Mrs. Gorton argues in response that the evidence of record is sufficient for a reasonable jury to find that Mr. Gorton was exposed to Cutler-Hammer's motor controllers onboard the United States Navy's "USS Blue" when he worked as an electrician mate from 1959 through 1961. As set forth fully in this opinion, while somewhat of a close call, viewing the evidence adduced in the light most favorable to the nonmovant, Mrs. Gorton, and drawing all reasonable inferences in her favor, the court must conclude that the evidence of record is sufficient for a reasonable jury to find that Mr. Gorton was exposed while onboard the USS Blue from 1959-1961 to asbestos during his work on Cutler-Hammer motor controllers and that exposure was a substantial factor in causing Mr. Gorton's mesothelioma and death. Eaton's motion for summary judgment will, therefore, be denied.

## II.      Procedural History

On June 23, 2017, this diversity action was removed from the Dauphin County Court of Common Pleas to the United States District Court for the Middle District of Pennsylvania. (ECF No. 1.) Mr. Gorton and Mrs. Gorton were the plaintiffs and named at least sixty-five defendants in the complaint, including Eaton. (Id. at 1-4.) The following six counts were asserted in the complaint: (1) count I: products liability; (2) count II: breach of implied warranty; (3) count III: negligence; (4) count IV: intentional conduct—fraudulent concealment; (5) count V: premises liability (*against only certain defendants not including Eaton*); and (6) count VI: loss of consortium. (Id.) All the claims except for count V for premises liability were asserted against Eaton. (Id.) In the complaint, it was alleged that the defendants caused Mr. Gorton to contract mesothelioma when he was exposed to asbestos while employed by or working with the products

manufactured by the defendants. On August 30, 2017, Eaton filed an answer to the complaint, affirmative defenses, and crossclaims against its codefendants. (ECF No. 144.)

Certain defendants engaged in motions practice with respect to the original complaint, and the court permitted the plaintiffs to file an amended complaint. On or about March 6, 2018, Mr. Gorton passed away. On July 9, 2018, Mrs. Gorton filed an amended complaint alleging for the first time that the negligent actions of the defendants, including Eaton, caused Mr. Gorton's death, i.e., Mrs. Gorton in the amended complaint for the first time set forth a claim of wrongful death against the defendants.[2]

---

[2] One court has explained:

> "In order to recover in an action for wrongful death, the plaintiff must prove that the death was caused by violence or negligence of the defendant. See 42 Pa.C.S. § 8301(a). Therefore, liability for wrongful death requires a determination that a defendant's negligence caused the death.....

Ruehl v. S.N.M. Enterprises, Inc., No. 1:15-CV-168, 2017 WL 1682569, at *5 (M.D. Pa. Jan. 12, 2017), report and recommendation adopted, No. 1:15-CV-168, 2017 WL 1541814 (M.D. Pa. Apr. 28, 2017). It is recognized in the asbestos context that when the plaintiff dies from his or her mesothelioma injuries after the commencement of an action, a wrongful death claim based upon the death is a "new claim" separate and distinct from claims asserted as survival actions. See e.g., I. Horst et al. v. Union Carbide Corp., et al., No. 15CV1903, 2017 WL 11657237, at *5 (Pa. Com. Pl. June 30, 2017) (recognizing in the asbestos context that a claim for wrongful death that accrues when a plaintiff dies from his or her mesothelioma injuries after the commencement of the action is a "new claim"); see Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936) (recognizing that a claim for wrongful death is independent of claims asserted on the decedent's behalf); Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 663 (Pa. Super. Ct. 2013) (same).

Here, in count three of the *original* complaint, Mrs. Gorton and Mr. Gorton alleged that defendants—including Eaton—were negligent and caused Mr. Gorton to contract mesothelioma. The amended complaint, which was filed after Mr. Gorton passed away, contains survival claims, which are the same claims asserted by Mr. Gorton in the original complaint, Mrs. Gorton's claims set forth in the original complaint, *and* a new wrongful death claim asserted by Mrs. Gorton based upon her husband's death. Based upon the foregoing, the court concludes that the amended complaint contained a *new claim*.

After motions practice by certain defendants with respect to the first amended complaint and the court's resolution of a motion for leave to file a second amended complaint, Mrs. Gorton filed a second amended complaint. (ECF No. 422.) The second amended complaint included amendments with respect to defendants in this case other than Eaton and not relevant to the motion currently pending before this court.

On April 11, 2022, Eaton filed the pending motion for summary judgment, brief in support of the motion, and a concise statement of material fact. (ECF Nos. 567, 568.) On May 6, 2022, Mrs. Gorton filed a responsive statement of facts and brief in opposition to the motion for summary judgment. (ECF Nos. 573, 574.) On May 20, 2022, Eaton filed a reply brief in support of its motion for summary judgment and a reply statement of facts. (ECF No. 579.) On May 31, 2022, Eaton filed the parties' Combined Concise Statement of Material Facts ("CCSMF"). (ECF No. 581.)

The motion for summary judgment having been fully briefed is now ripe for disposition by the court.

### III.    Factual Background

From the 1930s through the early 1980s, Cutler-Hammer, which in 2002 became known as "Eaton Electrical Inc." (CCSMF (ECF No. 581) ¶ 9; ECF No. 573-11 at 3), manufactured and sold electrical equipment and friction products containing asbestos, (ECF No. 573-11 at 4). Cutler-Hammer began selling its products to the United States Navy as far back as 1904. (ECF No. 573-12 at 3.) Cutler-Hammer manufactured motor controllers that were suitable for use aboard Navy ships and submarines. (ECF No. 573-13 at 6.) Cutler-Hammer manufactured and sold electrical equipment, some of which may have incorporated asbestos-containing components, from the 1930s through early 1980s. (ECF No. 573-11.)

In 1959, after Mr. Gorton completed electrician school, he was assigned as an electrician mate to the USS Blue, which was a support ship for aircraft carriers. (CCSMF (ECF No. 581) ¶ 6; ECF No. 573-2 at 15.) Approximately 350 people were assigned to the USS Blue. (ECF No. 573-2 at 19.) Electrician mates were required to complete a daily four-hour watch in an engine room[3] of the USS Blue. (CCSMF (ECF No. 581) ¶ 7; ECF No. 573-2 at 17.) There were two engine rooms onboard the USS Blue. (ECF No. 573-5 at 16.) There were four electrician mates and two supervisors. (ECF No. 573-5 at 13.) When the electrician mates were not on the four-hour watch, they performed repairs and maintenance on electrical distribution systems on board the USS Blue. (Id. ¶ 8.)

Mr. Gorton identified Cutler-Hammer as one of the manufacturers of motor controllers, electrical motors, and other electrical equipment onboard the USS Blue on which he performed work. (CCSMF (ECF No. 581) ¶¶ 9, 31; ECF No. 573-3 at 35-36; ECF No. 573-5 at 43-46.) A motor controller regulates the voltage and amperage of electricity that goes to an electric motor. It starts, stops, and controls the speed of the electric motor. (ECF No. 573-13 at 7.) The components of a motor controller are: the box, the electrical enclosure, the internal switches, internal wires going to capacitors, and rheostats and other internal electrical components. (Id. at 7-8.) The motor

---

[3]     An engine room was described as follows:

[I]t had walkways. There was, like, three feet wide. And where our switchboards were, it might have been four feet wide. And right off the switchboard was the control valves for the speed and the generator, which the machinist worked on to control the speeds of the generator--not generator, the reduction gears.

     It was like a walkway between each one. It was all right there together. It wasn't much wider than four or five feet, where you could pass each other.

(ECF No. 573-5 at 34.)

controller supplied by Cutler-Hammer to the Navy contained a "complete unit." (Id. at 8.) Mr. Gorton described a motor controller as follows:

> [I]t is the switching unit. It would have buttons on it, and it has contacts inside, and when you turn it on, it provides the power to the pump, so it's actually a switch….Some of it was bakelite.[4] The portion where the contacts of the switch inside the termination points were on bakelite strips, and that definitely was asbestos material.

(ECF No. 573-3 at 35.)  The motor controllers were enclosed in steel boxes that were either 8" by 8" or 2' by 2'. (ECF No. 573-2 at 40.) The Cutler-Hammer motor controllers were gray and had the Cutler-Hammer logo (which was red and black) on them. (ECF No. 573-3 at 185.) Mr. Gorton described the contents of a motor controller as follows:

> In the controllers there was [sic] contacts. The power leads would come in usually from the bottom, terminate on a screw connection on the bottom and these were separated by insulators because of—there was three legs to the circuit so they had separators in there to keep them from shorting out, and that's where the wires would terminate, on the base of those contacts.

(ECF No. 573-2 at 41.) The insulators were vertical and brown and insulated the legs of the circuit, which produced heat from current flow. (Id. at 41-43.) There were "a lot" of motor controllers onboard the USS Blue. Mr. Gorton explained:

> Oh, goodness, I couldn't estimate, but there were a lot of them, because everything operated -- even the exhaust fans would operate off of these above deck, not even in the engine rooms or fire rooms, but they'd be in various compartments on the ship.

---

[4]     Union Carbide manufactured and marketed a product comprised of "as much as 50 percent" asbestos under the name "Bakelite." (ECF No. 573-6 at 3.) Bakelite containing "phenolic resins…that contained asbestos" were primarily marketed to Cutler Hammer, among others. (ECF No. 573-7 at 21.) Asbestos was used as a filler by Union Carbide in its plastics, which were to be used as electrical switch boxes, plug-in receptacles, and radio components. (ECF No. 573-9 at 6.) In 1972, Union Carbide began to develop an asbestos-free molding compound, and by 1974, it developed an asbestos-free molding compound. (ECF No. 573-9 at 21.)

(ECF No. 573-3 at 40-41.)

Mr. Gorton described the frequency of his work on the motor controllers as follows:

Whenever there was a malfunction of a pump or a electrical device, the control mechanism had to be checked out. Usually the arcing would appear on the contacts and you'd reburnish -- re -- I'm trying to think of the word -- burnish the contacts in the controller, which means it's cleaning them up so that it makes better contact and the motor would function.
…
There was so many on board it was just a constant flow. Maybe not on the one particular one, but there was so many of them it was a constant job function. There would always be at least one or two somewhere that were malfunctioning.

(ECF No. 573-3 at 40.) In other words, Mr. Gorton worked on motor controllers as a regular part of his daily job onboard the USS Blue. Those motor controllers contained asbestos. (ECF No. 573-2 at 24-26.) Specifically, Mr. Gorton learned in electrician school that the Bakelite material and fuses inside the motor controller contained asbestos. (CCSMF (ECF No. 581) ¶ 14) ¶ 10; ECF No. 573-2 at 42-43; ECF No. 573-3 at 38-39, 89, 198.) Mr. Gorton further explained his belief that the motor controllers contained asbestos as follows:

Anytime the cable passed through a bulkhead, we would handle a sealing compound made up of asbestos, any type of—in the controllers there was separators between the circuits that were made of asbestos material. It produces a lot of heat. Anytime you have electric flow, you have heat. There's a problem with that so it has to be separated by these insulators.

(ECF No. 573-2 at 24-25.)

Mr. Gorton's work on the motor controllers, which had fuses in them, caused him to disturb the separators. (Id. at 25.) He explained:

Those disturbances were made of the wires going into the contacts where you would use a screwdriver to back the screw out and the separators were so close in proximity to those screws you would rub them or gouge them when you backed the screw out to disconnect the wiring.

(Id. at 25.) Mr. Gorton's work on the motor controllers disturbed the asbestos in the controllers and would cause dust to "go up in the air." (ECF No. 573-5 at 44, 116.) Working on the motor

7

controllers was a "dusty process" and Mr. Gorton was "sure" he breathed in the dust created by this work. (ECF No. 573-3 at 37-38.) Mr. Gorton was also exposed to asbestos from work on motor controllers that had arc shields[5] on them that were made of asbestos. (ECF No. 573-5 at 43-46.)

Mr. Gorton did not know the brand name or manufacturer of the fuses[6] that he associated with the motor controllers. (CCSMF (ECF No. 581) ¶ 11.) Mr. Gorton never saw the word "Bakelite" written on any piece of equipment, a component part, or any product literature, (CCSMF (ECF No. 581) ¶ 14), or literature that explained the materials of which the controllers were comprised, (id. ¶ 15). Mr. Gorton did not attribute any asbestos exposure to cleaning contactors in the motor controllers. (CCSMF (ECF No. 581) ¶ 18.)

Karl Thompson ("Thompson") served as an electrician mate onboard the USS Blue alongside Mr. Gorton. (CCSMF (ECF No. 581) ¶ 22.) Thompson served in the Navy from 1958 to 1962. (CCSMF (ECF No. 581) ¶ 21.) He met Mr. Gorton on board the USS Blue in late 1959 or early 1960. (CCSMF (ECF No. 581) ¶ 22.) Mr. Gorton and Thompson served as two of four electrician mates aboard the USS Blue until December 1961 when Thompson left the USS Blue to work on another ship. (CCSMF (ECF No. 581) ¶ 23.) Thompson did not receive formal training

---

[5]     Thompson described an "arc shield" as follows: "An arc shield goes over your contacts. When they make contact, you have a little arc. It prevents it from splashing over." ECF No. 573-5 at 45.) Thompson described the insulation as "pressed cardboard in the form." (ECF No. 573-5 at 50.)

[6]     Mr. Gorton explained the role of the fuses as following:

   [T]he fuses would take care of a shortage or a disruption in the electrical flow for various reasons. If it shorted out or as an overload, the fuse would blow just like, you know, fuses in a home. And those fuses had asbestos material inside -- inside the fuse itself, it was like a cartridge, is what it looked like.

(ECF No. 573-3 at 36.)

in the identification of asbestos or asbestos-containing products. (CCSMF (ECF No. 581) ¶ 24.) Thompson identified Cutler-Hammer as one of the manufacturers of motor controllers onboard the USS Blue on which Mr. Gorton and he worked. (CCSMF (ECF No. 581) ¶ 26; ECF No. 573-5 at 46-47.)

Thompson and Mr. Gorton maintained, inspected, and repaired all the electrical systems onboard the USS Blue and performed switchboard watches on the main generators while the ship was underway. (ECF No. 573-5 at 12-14.) Mr. Gorton's duties as an electrician's mate required him to perform maintenance, testing, and repair on all electrical equipment onboard the USS Blue including lighting, motors, generators, controllers, motor controllers, pumps, and any other equipment that was electrical. (CCSMF (ECF No. 581) ¶ 33.) Mr. Gorton regularly worked on the 110, 240, and 440 voltage equipment. (ECF No. 573-5 at 20-21.) Mr. Gorton worked on all electrical equipment including motor fans, motor controllers, electrical motors for pumps, all circuit breakers, and all communications equipment. (ECF No. 573-5 at 20-21.)

Mr. Gorton worked directly on or in the immediate vicinity of others working on pumps, electrical motors, and controllers all over the USS Blue. He worked mainly in the engineering spaces, including the engine and boiler rooms.[7] Mr. Gorton had responsibility for the electrical motors, which were the driving force that operated the pumps, motors, and controllers. (CCSMF (ECF No. 581) ¶ 32.) Mr. Gorton also worked in the electrical shop onboard the USS Board for very brief periods on a daily basis. (ECF No. 573-2 at 85-86.)

As part of Mr. Gorton's daily duties, he worked alongside machinist mates and other shipmates as they performed maintenance and repair on various pieces of equipment. (CCSMF

---

[7]     There were two boiler rooms onboard the USS Blue, which are also referred to as "fire rooms." (ECF No. 573-5 at 25.)

(ECF No. 581) ¶ 34.) Mr. Gorton's work was performed "all over" USS Blue and in every compartment on board the vessel. (ECF No. 573-3 at 24-25.) Mr. Gorton and Thompson worked directly with or in the direct vicinity of every piece of equipment in the engineering spaces and other parts of USS Blue including, the ship's turbines, generators, motors, boilers, pumps, valves, hoses, fans, switches and all the cables, wires, voltage regulators, switchboards, controllers, and arc shields. Most, if not all, of the equipment, contained asbestos insulation, gaskets, and packing. (ECF No. 573-4 ¶ 10.)

In 1961, USS Blue went into drydock at Hunter's Point Naval Shipyard in California. Mr. Gorton stood an eight-hour fire watch every day on the ship in the engine room or fire room. The overhaul lasted approximately one year and was a complete "FRAM" overhaul. The entire ship was stripped down to the superstructure. All the equipment, including the propulsion system and rerouted fuel and steam lines, was overhauled, replaced, or refurbished. Mr. Gorton and other electricians cut and removed all the electrical components, including light, cables, motors, motor controllers, and fans, from the USS Blue. The removal of the electrical components created a lot of asbestos dust, which was inhaled by Mr. Gorton as he breathed. (ECF No. 573-2 at 31-33; ECF No. 573-3 at 23.) Mr. Gorton and the other electricians would stand less than ten feet away from the civilian contractors as they performed their work during the overhaul. (ECF No. 573-5 at 15.) Thompson and Mr. Gorton worked Monday through Friday during the overhaul. Mr. Gorton also worked some weekends. (ECF No. 573-5 at 15.)

Howard Kipen, M.D., prepared an expert report in this case which provides, among other things, that: "To a reasonable degree of medical certainty, Mr. Gorton's mesothelioma is attributable to the cumulative effects of all of his direct and indirect occupational asbestos

exposures[,]" including his work onboard the USS Blue as an electrician's mate. (ECF No. 573-20 at 4.)

Richard Kradin, M.D., prepared an expert report and supplemental report in this case. (ECF No. 573-21.) He opined, among other things, that: (1) Mr. Gorton suffered from diffuse malignant mesothelioma, id. at 2; (2) brief and low-level asbestos exposures can cause mesothelioma, id. at 11; and (3) Mr. Gorton's diffuse malignant mesothelioma is attributed to his cumulative exposures to asbestos, including his exposures in the Navy to motors, turbines, valves, pumps, packing, gaskets, rope, pipe insulation, and separators, manufactured by, among others, Cutler-Hammer, id. at 3-4.

### IV.   Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, must draw all reasonable inferences in favor of the non-moving party, and resolve all doubts in favor of the nonmoving party.  Doe v. Cty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## V. Discussion

### A.  Pennsylvania Law Applies to this Case.

Eaton argues that admiralty law applies to this case. Mrs. Gorton argues that Pennsylvania law applies to this case. Whether admiralty law applies to this case is dependent upon whether Mrs. Gorton invoked this court's admiralty jurisdiction. One district court has explained:

> The Supreme Court has established a two-part test to determine if a tort claim is an admiralty or maritime claim for jurisdictional purposes: first, the alleged tort must have "occurred on navigable water" or have been "caused by a vessel on navigable water"; and second, " 'the general features of the type of incident involved' " (a) must be of a nature that "has 'a potentially disruptive impact on maritime commerce,' " and (b) must have a general character that "shows 'a substantial relationship to traditional maritime activity.' " Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995) (quoting Sisson v. Ruby, 497 U.S. 358, 363-65, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)).

Vargas v. APL Ltd., No. 15CV6981ILGRML, 2022 WL 757082, at *5–6 (E.D.N.Y. Mar. 11, 2022). The court in Vargas recognized, however, that:

> just because a claim may arise under admiralty jurisdiction does not mean that it's pleading necessarily invokes the Court's admiralty jurisdiction. Rather, where

alternative bases for jurisdiction exist, a plaintiff may choose under which to proceed. This choice is important because, although the admiralty and civil systems were joined in 1966, there remain differences in procedure and remedies available between the two.

Id.

The procedures for invoking the admiralty jurisdiction of a district court are set forth in Federal Rule of Civil Procedure 9(h), which provides:

> A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15. A case that includes an admiralty or maritime claim within this subdivision is an admiralty case within 28 U.S.C. § 1292(a)(3).

FED.R.CIV.P. 9(h). One district court has explained the "consequence" of a plaintiff identifying a claim as arising under admiralty jurisdiction as follows:

> The most relevant consequence for our purposes of an identification of a claim as an admiralty or maritime claim is that the matter is subject to bench trial. Rule 9(h) "effectively precludes trial by jury for cases in which the court has jurisdiction through admiralty or some other means and the plaintiff identifies the claim as one brought in admiralty, and those in which the court's exclusive jurisdiction is in admiralty." Gaines v. Ampro Fisheries, Inc., 836 F.Supp. 347, 348–49 (E.D.Va.1993). Federal Rule of Civil Procedure 38(e) also provides that "[t]hese rules shall not be construed to create a right to trial by jury of the issues in an admiralty or maritime claim within the meaning of Rule 9(h)." Fed.R.Civ.P. 38(e).

Garczynski v. Rossilli, No. CIV.A. 00-1553, 2002 WL 35072899, at *1 (D.N.J. Apr. 5, 2002).

It is clear within the Third Circuit that when a "plaintiff is pleading alternative theories of subject matter jurisdiction, the plaintiff need not reference Rule 9(h) specifically to invoke the admiralty jurisdiction of the court." Id. at *2 (citing Foulk v. Donjon Marine Co., 144 F.3d 252, 256 (3d Cir. 1998)).

13

In discussing the language in a complaint necessary to invoke admiralty or maritime jurisdiction in cases with multiple bases for jurisdiction, the Third Circuit [Court of Appeals] has held that "[t]o invoke admiralty jurisdiction ... a plaintiff must affirmatively insert a statement in the pleadings identifying the claim as an 'admiralty' or maritime claim.' " Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 73 (3d Cir.1996). Whether a plaintiff sufficiently invokes admiralty jurisdiction is evaluated under the totality of the circumstances, which includes the "parties' manifestation of intent" as demonstrated by their pleadings and subsequent conduct. Foulk, 144 F.3d at 256–57.

Id.

Here, Mrs. Gorton did not manifest any intent to invoke this court's admiralty jurisdiction. Crane Co., a former defendant, removed this action to this court from the Dauphin County Court of Common Pleas on the basis of federal officer jurisdiction, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446. (ECF No. 1 at 1.) Crane Co. explained:

1. On May 17, 2017, Plaintiffs filed their Complaint in the Dauphin County Court of Common Pleas and served it on Crane Co. on May 25, 2017. See a true and correct copy of the Complaint attached hereto as Exhibit "A." In the Complaint, Plaintiffs allege that Mr. Gorton was exposed to asbestos from Defendants' products from April 1959 to June 1962 at the Hunter's Point Naval Shipyard, San Francisco, CA; Long Beach Naval Shipyard, Long Beach, VA; and on board USS Blue, DD-744. See Ex. A., Paragraph 8(a).

2. On May 25, 2017, Plaintiff, Thomas Gorton, was deposed and testified that he encountered Crane Co. pumps and valves while working as an electrician on board the USS Blue in the U.S. Navy from 1959 to 1962. See Relevant Portions of Thomas Gorton's deposition testimony attached hereto as Exhibit "B."

3. The allegation that Mr. Gorton was exposed to Crane Co. products while serving in the U.S. Navy gives rise to Crane Co.'s federal defense—often referred to as the government contractor defense. In short, any product that Plaintiffs allege Crane Co. manufactured for or supplied to the Navy (and any product literature, labeling, or warnings that accompanied that product) would be subject to Navy specifications and requirements. Federal officers exercised their discretion regarding whether (1) asbestos was used in the product and (2) whether a warning would accompany the product (and if so, what it would say). Without approval from a federal officer, Crane Co.'s products could not have been used by the Navy.

(Id. ¶¶ 1-3.) In Eaton's response to Mrs. Gorton's pleadings, it also set forth, among other defenses,

the government contractor defense as follows:

> TWENTY-THIRD AFFIRMATIVE DEFENSE Eaton alleges that its products, and that of its successors-in-interest, were manufactured, produced, supplied, sold and distributed in mandatory conformity with specifications promulgated by the United States Government under its war powers, as set forth in the United States Constitution, and that any recovery by Plaintiff-Decedent on the Complaint on file herein is barred in consequence of the exercise of those sovereign powers.
>
> TWENTY-FOURTH AFFIRMATIVE DEFENSE Eaton alleges that the asbestos, "asbestos products," or asbestos-containing products, used or in place at any premises, if any, for which this Eaton had any legal responsibility, were manufactured, packaged, distributed, sold or supplied in accordance with contract specifications imposed by the United States Government, by state governments, by Plaintiff-Decedent's employers, by its co-Defendants or by third parties yet to be identified.
>
> TWENTY-FIFTH AFFIRMATIVE DEFENSE Eaton alleges that all of its conduct and activities as alleged in Plaintiff-Decedent's Complaint conformed to statutes, governmental regulations and industry standards based upon the state of knowledge existing at all relevant times.

(ECF No. 144 at 17-18.)

In the first amended complaint and second amended complaint, Mrs. Gorton alleged this

court had jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), and Mrs. Gorton did not make any

statement or reference to Rule 9(h), admiralty jurisdiction, or maritime law. Under those

circumstances, Mrs. Gorton did not invoke this court's admiralty jurisdiction, and, therefore,

maritime law does not apply to this case.

This case is before this court based upon federal-officer jurisdiction, pursuant to 28 U.S.C.

§ 1442(a)(1). One district court has explained:

> " 'A federal court's role under § 1442(a) is similar to that of a federal court sitting in diversity.' " Gallelli v. Professional Ins. Management, 1994 WL 45729, at *3 (E.D.Pa. Feb. 10, 1994) (citing Mitchell v. Aluisi, 872 F.2d 577 (4th Cir.1989)). Accordingly, the federal court applies the choice of law rules of the forum state to determine the applicable law. Gallelli, 1994 WL 45729, at *3.

Winters v. Diamond Shamrock Chem. Co., 941 F. Supp. 617, 620 (E.D. Tex. 1996), aff'd, 149

F.3d 387 (5th Cir. 1998). "[B]efore a choice of law question arises, there must actually be a

conflict between the potentially applicable bodies of law." On Air Ent. Corp. v. Nat'l Indem. Co.,

210 F.3d 146, 149 (3d Cir. 2000). Mrs. Gorton and Eaton agree that—to the extent admiralty law

does not apply to this case—Pennsylvania common law applies to the claims asserted against

Eaton. In other words, the parties do not argue that a conflict of law exists between Pennsylvania

law and another potentially applicable state body of law. As discussed above, Eaton's argument

that admiralty law applies to this case is misplaced because Mrs. Gorton did not invoke this

court's admiralty jurisdiction. The court, therefore, will apply Pennsylvania law to resolve

Eaton's motion for summary judgment.

## B.  Specific Causation is the Only Issue Raised.

In each of Mrs. Gorton's five claims asserted against Eaton under Pennsylvania common

law,[8] she alleges that Eaton's asbestos-containing products *caused* Mr. Gorton's mesothelioma

and death. The only element of the claims disputed by Eaton in its motion for summary judgment

is the issue of specific causation. Eaton argues that it is entitled to summary judgment because

Mrs. Gorton did not adduce evidence of record upon which a factfinder may conclude that it is

more likely than not that Eaton caused Mr. Gorton's injuries. Specifically, Eaton argues that Mrs.

Gorton did not adduce any evidence upon which a reasonable jury may find that Mr. Gorton

"ever encountered an asbestos-containing product attributable to Cutler-Hammer" onboard the

USS Blue. (ECF No. 567 at 6.)  According to Eaton, Mr. Gorton: (1) did not know the brand

---

[8]      Mrs. Gorton asserts the following Pennsylvania state-law claims against Eaton in the
second amended complaint: (1) product liability; (2) breach of implied warranty; (3) negligence;
(4) fraudulent concealment; and (5) wrongful death. (ECF No. 422.)

name or manufacturer of the fuses that he associated with the Cutler-Hammer controllers; (2) did

not identify the manufacturer of Bakelite, which was used in the motor controllers on which he

worked; and (3) did not have personal knowledge that the Bakelite contained asbestos. Eaton

argues that Thompson did not review any literature or documents about the components of the

Cutler-Hammer motor controllers and was not formally trained in the identification of asbestos.

(Id. at 11.) Eaton also argues that Mrs. Gorton failed to adduce any evidence to show that Mr.

Gorton was exposed to any Cutler-Hammer asbestos-containing products with sufficient

frequency, regularity, and proximity to create a triable issue of fact with respect to causation. (Id.

at 12-13.)

"To establish causation in an asbestos case the plaintiff must prove the exposure

to asbestos caused the injury and that it was the defendant's asbestos-containing product that

caused the injury." Moore v. Ericsson, Inc., 7 A.3d 820, 824 (Pa. Super. Ct. 2010).

"Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a

defective product manufactured or sold by the defendant, but that the plaintiff's exposure was a

substantial factor in causing the plaintiff's injury." Smeal v. Clark Equip. Co., No. CV 19-5853,

2022 WL 1265532, at *5 (E.D. Pa. Apr. 28, 2022). To defeat a defendant-manufacturer's motion

for summary judgment in an asbestos case,

> "[the] plaintiff must present evidence to show that he inhaled asbestos fibers shed
> by the specific manufacturer's product. Therefore, a plaintiff must establish more
> than the presence of asbestos in the workplace; he must prove that he worked in the
> vicinity of the product's use. Summary judgment is proper when the plaintiff has
> failed to establish that the defendants' products were the cause of plaintiff's injury."

Floyd v. Astenjohnson, Inc., No. 3663 EDA 2015, 2017 WL 219076, at *2 (Pa. Super. Ct. Jan.

19, 2017) (quoting Krauss v. Trane U.S. Inc., 104 A.3d 556, 563 (Pa. Super. Ct. 2014)). "Trial

courts are to evaluate and 'distinguish[ ] cases in which the plaintiff can adduce evidence that

there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product.'" Smeal, 2022 WL 1265532, at *5 (quoting Rost v. Ford Motor Co., 151 A.3d 1032 (Pa. 2016)).

"[T]o determine whether plaintiff has provided sufficient evidence that defendant's products were the cause of plaintiff's injuries,…[Pennsylvania state] courts apply the 'frequency, regularity, proximity standard.'" Id. The Superior Court of Pennsylvania described the "frequency, regularity, and proximity" test at the summary judgment stage as follows:

> [C]ourts should make a reasoned assessment of whether, in light of the evidence on the frequency, regularity, and proximity of a plaintiff's alleged exposure, a jury could draw a sufficient causal connection between the defendant's product and the asserted injury. Id. at 290, 943 A.2d at 227. Therefore, the relevant inquiry under a manufacturer's motion for summary judgment is "whether [a] plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant." Vanaman, supra at 607.
>
> …
>
> [The frequency, regularity, and proximity test], however, is not a rigid test that sets an absolute threshold required to support liability. Gregg, supra at 290, 943 A.2d at 225. Rather, courts should apply…[the frequency, regularity, and proximity test] in an evaluative fashion, in a way tailored to the facts and circumstances of the case. Linster v. Allied Signal, Inc., 21 A.3d 220, 224 (Pa.Super. 2011), appeal denied, 614 Pa. 714, 38 A.3d 826 (2012). **Application of the test becomes less stringent where the plaintiff produces specific evidence of exposure to a defendant's product.** Id. Similarly, in cases involving mesothelioma, the frequency and regularity requirements should become "less cumbersome." Id. A plaintiff cannot survive summary judgment, however, if a jury would need to speculate to find in plaintiff's favor. Krauss v. Trane U.S. Inc., 104 A.3d 556, 568 (Pa.Super. 2014).

Kardos v. Armstrong Pumps, Inc., 222 A.3d 393, 399–400 (Pa. Super. Ct. 2019); see Gregg v. V-J Auto Parts, Co., 943 A.2d 216, 225 (Pa. 2007) (explaining that in cases involving asbestos and mesothelioma, the application of the "frequency, regularity, proximity factors" is "'somewhat

less critical' where the plaintiff puts forth specific evidence of exposure to a defendant's product") (quoting <u>Tragarz v. Keene Corp.</u>, 980 F.2d 411 (7th Cir. 1992)).

"[T]he frequency and regularity prongs become 'somewhat less cumbersome' in cases involving diseases that the plaintiff's competent medical evidence indicates can develop after only minor exposures to asbestos fibers." <u>Id.</u> The Supreme Court of Pennsylvania, however, "has made clear that a plaintiff cannot establish substantial factor causation merely by putting forth expert testimony opining that 'each and every breath' of asbestos (or inhalation of a single or de minimis number of asbestos fibers) can cause injury." <u>King v. Allen Bradley Co.</u>, No. CV 2:13-06106, 2015 WL 12843905, at *1 (E.D. Pa. Feb. 27, 2015) (quoting <u>Betz v. Pneumo Abex, LLC</u>, 44 A.3d 27, 54-58 (Pa. 2012)). One district court has explained:

> The nexus between a specific asbestos product and a plaintiff's medical condition may be supplied by a variety of direct and circumstantial evidence. <u>Lilley v. Johns–Manville Corp.</u>, 408 596 A.2d 203, 207 (Pa. Super. Ct. 1991). "The testimony of any witness with knowledge regarding the plaintiff's workplace and his or her exposure to a defendant's asbestos-containing products is admissible when probative." <u>Id.</u>

<u>Smeal</u>, 2022 WL 1265532, at *6.

In <u>Lamson v. Georgia-Pacific LLC</u>, No. 1459 EDA 2018, 2019 WL 2226053, at *3–4 (Pa. Super. Ct. May 22, 2019), the plaintiff-appellant alleged that while working at a Navy Yard in Philadelphia, Pennsylvania, he developed mesothelioma after working on, among other things, fire doors that contained asbestos and were manufactured by the defendants. The trial court granted summary judgment in favor of the defendant-manufactures because:

> (1) Appellant failed to demonstrate that he worked on fire doors manufactured by Appellees, (2) even if Appellant worked on fire doors made by Appellees, he failed to demonstrate that they contained asbestos, and (3) even if they contained asbestos, the type of work Appellant performed did not expose him to asbestos.

<u>Id.</u> at *4.

The plaintiff-appellant appealed. The Pennsylvania Superior Court reversed the decision of the trial court. With respect to the first issue, i.e., whether the plaintiff-appellant adduced evidence to show that he worked on fire doors manufactured by the defendants, the appellate court explained:

> Appellant's testimony establishes that he worked as a carpenter for nine years at DuPont and the Navy Yard and then worked at the Navy Yard for two more decades as an inspector and general foreman. As a carpenter, he had considerable experience repairing and installing fire doors, and as an inspector and general foreman, he had considerable experience supervising other carpenters. Boehmer, Appellant's co-worker and fellow carpenter, corroborated Appellant's testimony. Boehmer frequently worked with fire doors and recalled that Appellant worked with them as well when he was a carpenter. Moreover, Appellant testified that the two most common brands of fire doors came from Weyerhaeuser and U.S. Plywood, IP's predecessor. Boehmer confirmed that Weyerhaeuser supplied fire doors to the Navy Yard. Viewed collectively, Appellant's and Boehmer's testimony demonstrates that Weyerhaeuser and U.S. Plywood supplied fire doors to DuPont and the Navy Yard, and that Appellant repaired and/or installed these fire doors as a carpenter at DuPont and the Navy Yard. We acknowledge that neither Appellant nor Boehmer specified what **number** of Weyerhaeuser or U.S. Plywood fire doors Appellant worked on or **the length of time** that Appellant worked on these doors. These omissions, however, go to the weight and credibility of Appellant's and Boehmer's testimony, issues that have no place at summary judgment. Such considerations are solely for the factfinder to resolve at trial. Estate of Hunter, 205 A.2d 97, 102 (Pa. 1964) ("the credibility of witnesses, professional or lay, and the weight to be given to their testimony is strictly within the proper province of the trier of fact").

Lamson v. Georgia-Pac. LLC, No. 1459 EDA 2018, 2019 WL 2226053, at *4 (Pa. Super. Ct. May 22, 2019) (emphasis in original).

With respect to the second issue, i.e., whether the fire doors manufactured by the defendants and worked on by the plaintiff-appellant contained asbestos, the court explained:

> Appellant demonstrated that work on a specific class of items—fire doors—created dust. Further, as discussed above, fire doors manufactured by Appellees were installed at DuPont and the Navy Yard. Viewed as a whole, this evidence demonstrates that Appellant's work on fire doors manufactured by Appellees generated dust.
>
> …

Appellant obtained admissions from Appellees themselves that their fire doors contained asbestos. Weyerhaeuser's corporate designee admitted having personal knowledge that some of Weyerhaeuser's fire doors manufactured before or during Appellant's employment at DuPont and the Navy Yard contained asbestos. IP admitted in its answers to interrogatories that some fire doors manufactured by U.S. Plywood before or during Appellant's employment at DuPont and the Navy Yard contained asbestos. We realize Appellees did not admit that every fire door they manufactured contained asbestos; nor did Appellant demonstrate that every fire door he worked on contained asbestos. Nevertheless, Appellant did not need to demonstrate that every fire door contained asbestos in order to survive summary judgment. As a victim of mesothelioma, he needed only to present evidence that asbestos was present in some fire doors manufactured by Appellees. Gregg, 943 A.2d at 225 (threshold for regularity and frequency of exposure becomes less cumbersome in case involving mesothelioma, which can develop after only minor exposure to asbestos). Appellees certainly can argue during trial that Appellant failed to show that all of Appellees' fire doors contained asbestos, but this argument goes to the weight and credibility of the evidence, not its legal sufficiency. Hunter, 205 A.2d at 102.

Id. at *4.

With respect to the third issue, i.e., whether the plaintiff-appellant's work on the fire doors exposed him to asbestos, the court relied upon the plaintiff-appellant's testimony that "he drilled or sawed into fire doors" to support the inference that the plaintiff's work "penetrated the asbestos core of the fire doors…thus generating dust containing asbestos particles" and exposing the plaintiff to asbestos. Id. at *5.

In Tragarz, the rationale of which was adopted by the Pennsylvania Supreme Court in Gregg,[9] the plaintiff-widow filed an Illinois products liability action against the defendants alleging that their asbestos-containing products caused her husband's mesothelioma and death. The plaintiff-widow presented the testimony of her deceased husband and his coworkers. The decedent testified that he cut one of the defendant's products and worked near others using the

---

[9]     The Pennsylvania Supreme Court has explained that it "adopted the 'frequency, regularity, and proximity' test, as refined and applied by the United States Court of Appeals for the Seventh Circuit in Tragarz." Rost, 151 A.3d at 1043.

products. Two of the decedent's former coworkers also testified that the decedent had worked alongside or six to eight feet of other workers cutting and using the product. Neither the decedent nor his coworker, however, could identify a specific job site at which the decedent was exposed to the defendant's asbestos-containing product. The defendant argued that the plaintiff-widow could not show that the decedent was exposed to the product unless the record contained evidence linking the exposure to asbestos to a specific job site. The court disagreed and explained:

> [W]hen the plaintiff puts forth direct testimony that he or she was exposed to the defendant's product, the testimony itself is evidence of proximity, and the failure to remember specific sites in which such an exposure occurred goes to the issue of credibility—an issue ordinarily within the province of the jury.

Tragarz, 980 F.2d at 419. The court explained, however, that establishing "exposure" to asbestos was not the end of the inquiry because under Illinois law, the plaintiff was required to show that the defendant's product was a "substantial factor" in causing the decedent's disease. Id. at 420. Under Illinois law, the "frequency, regularity, and proximity of exposure" test is used to determine whether the "injured party's exposure to defendants' asbestos products was a substantial factor in causing the alleged injury." Id.

The court explained that the "frequency, regularity, and proximity of exposure" test was not "rigid…with an absolute threshold level necessary to support a jury verdict." Tragarz, 980 F.2d at 420. The court recognized that the test has "diminished importance when a plaintiff relies on direct evidence of exposure as opposed to circumstantial evidence." Id. The court explained:

> [M]any of the decisions that have dismissed cases based on the failure to adequately demonstrate frequency, regularity, and proximity, whether or not specifically mentioning this test, have been cases in which the plaintiff attempted to *prove exposure* through circumstantial evidence that an asbestos product was at a particular place over a particular time and that the injured party was at or near that place at that time.

…

> For example, in <u>Zimmer</u> the plaintiff put forth circumstantial evidence that he worked in several shipyards over a nearly fifteen-year period. One of these shipyards covered two square miles and employed about 55,000 people. <u>Zimmer</u>, 140 Ill.Dec. at 232, 549 N.E.2d at 883. Moreover, the plaintiff worked on hundreds of ships during this time period. Plaintiff's only evidence of probable exposure, to all but Johns–Manville Sales Corporation's products, was affidavits of various workers who remembered seeing various defendants' asbestos products on different ships that plaintiff worked on sometime in this fifteen-year period. Yet, there was no evidence with regard to the time in which the plaintiff worked on any one of these ships nor was there evidence indicating the time in which the witnesses saw defendants' products on these numerous ships. <u>Id.</u> at 231–33, 549 N.E.2d at 883–84. This meant that the plaintiff failed to put forth evidence placing himself anywhere near the defendants' products. In such a situation, the failure to show that he was in proximity to the defendants' products with any regularity or frequency, meant that the plaintiff failed to sustain his burden of demonstrating probable exposure, and therefore summary judgment was warranted. <u>Id.</u> at 233, 549 N.E.2d at 884.

<u>Tragarz</u>, 980 F.2d at 420–21.

The court in <u>Tragarz</u> noted that the plaintiff-widow set forth factual allegations sufficient to prove that the decedent was *exposed* to the defendant's asbestos-containing products. The issue before the court was not whether the decedent was exposed to the defendant's asbestos-containing products, but whether that exposure was a *substantial* factor in causing the decedent's disease. The court explained that while the frequency, regularity, and proximity test is not "irrelevant when determining whether the plaintiff has proved that the exposure to defendant's product was a substantial factor in causing the resulting disease[,]" the "factors become somewhat less critical when a party puts forth direct evidence of exposure to a defendant's products." <u>Id.</u> at 421. The court emphasized that in cases dealing with mesothelioma, application of the three factors is "even less rigid" when the plaintiff adduces medical testimony that "mesothelioma can result from minor exposures to asbestos products." <u>Id.</u>

The court held that in the case before it, there was "ample evidence" that a person's "low exposures of asbestos induce and contribute to the development of mesothelioma[,]" the

decedent on more than one occasion worked near or with the defendant's asbestos-containing products, and that "substantial amounts of dust" covered workers like the decedent. Id. The court held that under those circumstances, the plaintiff-widow set forth sufficient evidence to show that the defendant's asbestos-containing products were a substantial factor in causing the decedent to develop mesothelioma. Id. As discussed above, although Tragarz was decided under Illinois state law, the Pennsylvania Supreme Court adopted as Pennsylvania state law the frequency, regularity, and proximity test "as refined and applied" by the court in Tragarz. Rost, 151 A.3d at 1043.

Here, Mr. Gorton adduced evidence of record sufficient to create a triable issue of fact about whether Cutler-Hammer's products onboard the USS Blue exposed Mr. Gorton to asbestos and were a substantial factor in causing his mesothelioma and death. Mrs. Gorton adduced evidence sufficient for a reasonable jury to find:

- Cutler-Hammer manufactured and sold electrical equipment, some of which may have incorporated asbestos-containing components, from the 1930s through early 1980s (ECF No. 573-11);

- Cutler-Hammer motor controllers were onboard the USS Blue (CCSMF (ECF No. 581) ¶¶ 9, 26; ECF Nos. 573-11 at 3; 573-5 at 46-47);

- the motor controllers onboard the USS Blue contained Bakelite (ECF No. 573-3 at 35);

- the Bakelite inside the motor controllers onboard the USS Blue contained asbestos[10] (ECF No. 573-3 at 198; ECF No. 573-6 at 3; ECF No. 573-9 at 21.)

---

[10]    Eaton argues that Mrs. Gorton cannot rely upon Mr. Gorton's statement that the Bakelite was comprised of asbestos. The Supreme Court of Pennsylvania has explained:

> Where ... a party proffers a witness expressing an opinion on matters such as the presence of asbestos in the workplace, the trial court must be rigorous in assuring that the lay witness satisfies the strictures of Rule [of Evidence] 701. In particular, the proponent of technical lay opinion testimony must show that the testimony is based on sufficient personal experience or the specialized knowledge of the witness. Pa. R. E. 602 .... Without meeting the requirements of Rule 701, the lay

- Mr. Gorton served as an electrician mate onboard the USS Blue from 1959 through 1961;

- Mr. Gorton worked on motor controllers daily onboard the USS Blue; indeed, at any given time, one or two motor controllers were malfunctioning (ECF No. 573-3 at 40; ECF No. 573-2 at 24-26.)

- Mr. Gorton worked on motor controllers manufactured by Cutler-Hammer while onboard the USS Blue (ECF No. 573-3 at 35);

- there were so many motor controllers onboard the USS Blue that Mr. Gorton could not estimate the number (ECF No. 573-3 at 40-41);

- there were four electrician mates onboard the USS Blue who serviced all the motor controllers onboard the ship (CCSMF (ECF No. 581) ¶ 23);

- working on motor controllers was a dusty process and exposed Gorton to asbestos (ECF No. 573-5 at 44, 116);

- during the FRAM overhaul, the entirety of the USS Blue was stripped down to the superstructure, and Mr. Gorton and other electricians cut and removed all the electrical components, including light, cables, motors, motor controllers, and fans, from the USS Blue (ECF No. 573-2 at 31-33; ECF No. 573-3 at 23);

- the removal of the electrical components created a lot of asbestos dust, which was inhaled by Mr. Gorton as he breathed (ECF No. 573-2 at 31-33; ECF No. 573-3 at 23);

- brief and low-level asbestos exposures can cause mesothelioma (ECF No. 573-21 at 11); and

---

opinion is not "rationally based on the perception of the witness" or truly "helpful" to the jury.

Gibson v. Workers' Comp. Appeal Bd., 861 A.2d 938 (Pa. 2004) (quoted by Smeal, 2022 WL 1265532, at *7).

      Mr. Gorton testified that his instructors in electrician school while in the Navy taught him that the Bakelite contained in the motor controllers onboard the USS Blue, including those manufactured by Cutler-Hammer, was comprised of asbestos. The training received by Mr. Gorton while in the Navy's electrician school provided Mr. Gorton sufficient personal experience and specialized knowledge for him to testify that the Bakelite was comprised of asbestos. Additionally, there is evidence of record that Union Carbide, the manufacturer of Bakelite, did not develop non-asbestos-containing Bakelite until 1974, well after Mr. Gorton disembarked from the USS Blue.

-   Mr. Gorton's diffuse malignant mesothelioma is attributed to his cumulative exposures to asbestos, including his exposures in the Navy as an electrician mate (ECF No. 573-21 at 3-4; ECF No. 573-20 at 4).

Based upon the foregoing, Mrs. Gorton adduced evidence sufficient for a reasonable jury to find that Mr. Gorton was exposed to asbestos contained in Cutler-Hammer's motor controllers while onboard the USS Blue. There is direct evidence that Mr. Gorton worked with Cutler-Hammer's motor controllers, which contained asbestos, while onboard the USS Blue, and medical testimony that low-level exposure to asbestos can cause mesothelioma. Thus, the frequency, regularity, and proximity factors are less cumbersome for Mrs. Gorton to overcome to show that Mr. Gorton's exposure to Cutler-Hammer's asbestos-containing products was a substantial factor in causing his mesothelioma and death.

Like in Tragarz, the proximity prong of the test is satisfied because Mr. Gorton testified that he worked on Cutler-Hammer motor controllers while onboard the USS Blue. It is a closer call with respect to the frequency and regularity prongs because Mrs. Gorton did not point to specific evidence showing how many Cutler-Hammer motor controllers were onboard the USS Blue or how frequently Mr. Gorton worked on the Cutler-Hammer motor controllers. The evidence of record, however, is sufficient for a reasonable jury to find based upon circumstantial and direct evidence that Mr. Gorton's exposure to asbestos via Cutler-Hammer's motor controllers was a substantial factor in causing his mesothelioma and death because Mr. Gorton worked on Cutler-Hammer motor controllers while onboard the USS Blue from 1959 through 1961, those motor controllers contained asbestos, the worked done by Mr. Gorton on a daily basis disturbed the asbestos inside the motor controllers and created dust in which Mr. Gorton breathed, and low-levels of asbestos exposure can cause mesothelioma. Under those circumstances, there is a triable issue of fact about whether Mr. Gorton's exposure to Cutler-

Hammer's asbestos-creating products was a substantial factor in causing Mr. Gorton's mesothelioma and death. Eaton's motion for summary judgment will, therefore, be denied.

## VI.    Conclusion

For the reasons set forth in this opinion, there are triable issues of fact in this case with respect to whether Mr. Gorton's exposure to Cutler-Hammer's asbestos containing-products was a substantial factor in causing Mr. Gorton's mesothelioma and death. Eaton's motion for summary judgment (ECF No. 567) will be denied. An appropriate order will be entered.

BY THE COURT,

Dated: October 13, 2022                    /s/ JOY FLOWERS CONTI
                                           Joy Flowers Conti
                                           Senior United States Court District Judge