**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RHONDA J. GORTON, Personal** | ) | **Civ. Action No.  1:17-1110** |
| **Representative for the Estate of** | ) | |
| **THOMAS D. GORTON, II, and in** | ) | |
| **her own right,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **Warren Pumps, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

### I.    Introduction

Decedent Thomas Gorton ("Mr. Gorton"), the husband of plaintiff Rhonda J. Gorton ("Mrs. Gorton"), developed mesothelioma, allegedly due to his occupational exposure to the asbestos-containing products manufactured by, among others, defendant Warren Pumps, LLC ("Warren Pumps").  Mrs. Gorton brought this lawsuit, which was removed to this court, on behalf of Mr. Gorton's estate and in her own right. Mrs. Gorton reached settlement agreements with many of the defendants in the litigation. Warren Pumps is the remaining defendant in this case.

Pending before the court is a motion for summary judgment filed by Warren Pumps. As fully explained in this opinion, the motion for summary judgment will be granted because—based upon the undisputed evidence of record—a trier of fact could not find in Mrs. Gorton's favor with respect to her fraudulent concealment claim and Warren Pumps is entitled to the government contractor defense, which is a defense to all other claims asserted by Mrs. Gorton.

II.     **Procedural History Relevant to the Filing of the Pending Motion for Summary Judgment**

On April 9, 2020, Mrs. Gorton filed the second amended complaint in this case. (ECF No. 422.) She asserts the following claims against Warren Pumps: (1) product liability; (2) breach of implied warranty; (3) negligence; and (4) fraudulent concealment. (Id.) Mrs. Gorton asserts a claim for loss of consortium, which is derivative of the four other claims she asserts against Warren Pumps. (Id.); Boldt v. Taylor, No. CV 21-03204, 2022 WL 2803105, at *7 (D.N.J. July 18, 2022). On February 9, 2022, Warren Pumps filed an answer to the second amended complaint. (ECF No. 563.)

On January 6, 2023, Warren Pumps filed the pending motion for summary judgment and material statement of facts. (ECF Nos. 595, 596.) On February 13, 2023, Mrs. Gorton filed a response in opposition to the motion for summary judgment and a responsive statement of material facts. (ECF Nos. 606, 607.)  On February 27, 2023, Warren Pumps filed a reply brief and a reply statement of facts. (ECF Nos. 609, 610.) On March 11, 2023, the parties filed the combined concise statement of material facts ("CCSMF"). (ECF No. 611.) The parties each substituted certain exhibits. (ECF Nos. 612, 614.) The motion for summary judgment having been fully briefed is now ripe to be decided by the court.

III.    **Factual Background**

A. **Mrs. Gorton's Service of the Complaints upon Warren Pumps**

On October 2, 2012, Mrs. Gorton filed a lawsuit in the Dauphin County Court of Common Pleas against Warren Pumps (and other defendants) alleging that Mr. Gorton contracted a *nonmalignant*, asbestos-related injury (the "non-malignancy" lawsuit). The non-malignancy lawsuit is venued in the Dauphin County Court of Common Pleas.

2

(CCSMF (ECF No. 611) ¶ 1.) On May 17, 2017, Mrs. Gorton filed this lawsuit in the

Dauphin County Court of Common Pleas, asserting a personal injury claim based upon

the allegations that Mr. Gorton contracted mesothelioma as a result of his exposure to

asbestos (the "personal injury lawsuit"). (Id. ¶ 2.)

On or about May 22, 2017, Mrs. Gorton via "Certified Mail" mailed the complaint

filed in the Dauphin County Court to:

> Warren Pumps, LLC
> 82 Bridges Avenue
> P.O. Box 969
> Warren, MA 01083

(ECF No. 595-5 at 2.) The "Domestic Return Receipt" indicates that on May 25, 2017,

the delivery was "Received by…D Evans" at the same address. (ECF No. 595-5 at 2.)

Warren Pump's registered agent was and currently is CT Corporation ("CT

Corp.") at 155 Federal St. Ste. 700, Boston, Massachusetts 02110. (ECF No. 595-6 ¶

6.) Claims, including asbestos-related injuries, are expected to be served on Warren

Pump's registered agent, CT Corp., and typically are served on CT Corp. to ensure that

the claim is properly received and defended in the applicable jurisdiction. (ECF No. 595-

6 ¶ 7.) If a legal pleading for asbestos-related claims is sent to Warren Pumps at 82

Bridges Ave, Warren, Massachusetts, it is forwarded to the appropriate handling

attorney for that respective jurisdiction. (ECF No. 595-6 ¶ 8.) Warren Pumps was not

aware of any alleged attempt by Mrs. Gorton to mail anything to Warren Pumps until it

was shown a certified return receipt with a date stamp of May 25, 2017, which indicated

that "D. Evans" signed for a certified mailing. (ECF No. 595-6 ¶ 9.)

Deborah Evans ("Evans") was a former employee at Warren Pumps from

approximately 2016 to 2020. She was hired to perform administrative tasks. (ECF No.

595-6 ¶ 4.) Evans was not: (1) an executive officer, partner or trustee or Warren Pumps; (2) a manager, clerk or other person in charge of any regular place of business or activity of Warren Pumps; or (3) an agent authorized by Warren Pumps in writing to receive service of process on behalf of Warren Pumps. (ECF No. 595-6 ¶ 5.)

On June 23, 2017, the personal injury lawsuit was removed to the United States District Court for the Middle District of Pennsylvania based upon federal officer jurisdiction, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446**.** (Id. ¶ 3.)

On March 6, 2018, Mr. Gorton passed away. (Id. ¶ 4.) On July 9, 2018, Mrs. Gorton filed an amended complaint in this personal injury lawsuit to substitute Mr. Gorton's estate as a party and assert an action for wrongful death. On April 9, 2020, Mrs. Gorton filed a second amended complaint. (Id. ¶ 5.) On October 6, 2021, Mrs. Gorton filed a motion for entry of default against Warren Pumps, LLC, which was entered by the Clerk of the Court on the same date. On January 7, 2022, the default judgment was vacated. (Id. ¶ 6.) The court ordered Mrs. Gorton to serve Warren Pumps with the second amended complaint on or before January 24, 2022. On January 19, 2022, Mrs. Gorton served the second amended complaint upon Warren Pumps, *via* CT Corp. (Id. ¶ 7.)

**B. Relevant Depositions with respect to the Motion for Summary Judgment**

Mr. Gorton was deposed twice with respect to his exposure onboard the USS Blue—once in 2011 as a co-worker in a separate case and once in 2017 with respect to this case. (CCSMF (ECF No. 611) ¶ 13.) Mr. Gorton's coworker onboard the USS Blue, Karl Thompson ("Thompson"), was also deposed with respect to this case. (Id.)

4

On May 17, 2011, Mr. Gorton testified in connection with a lawsuit filed in Madison County, Illinois, on behalf of Alvin Nall ("Nall") whom Mr. Gorton met while serving in the United States Navy. (Id. ¶ 14.) Mr. Gorton and Nall attended electrician mate school for eighteen weeks. (Id. ¶ 15.) They learned about working with electricity with respect to electrical motors, controllers, electrical distribution, generators, and other electrical items. (Id.) In late 1959, Mr. Gorton and Nall were assigned to the USS Blue. Id.

### C. Mr. Gorton's Service onboard the USS Blue

#### 1. Generally

From 1959 to 1961, the USS Blue performed ship maneuvers and battle exercises off the coast of California in the Pacific Ocean.  (CCSMF (ECF No. 611) ¶ 47.) Mr. Gorton boarded the USS Blue toward the end of 1959. (CCSMF (ECF No. 611) ¶ 44.) Warren Pumps manufactured fire and bilge pumps, emergency feed pumps, and main condenser circulating pumps that were onboard the USS Blue during Mr. Gorton's service. (ECF No. 606-6 at 5.) The pumps manufactured by Warren Pumps onboard the USS Blue utilized braided asbestos packing.[1] (ECF No. 606-10 at 7.) Mr. Gorton never saw a warning on any of the equipment in the compartments below deck from the manufacturer with respect to the hazards of asbestos. (ECF No. 595-2 at 116.)

#### 2. Mr. Gorton's Duties as an Electrician Mate

While serving aboard the USS Blue, Mr. Gorton worked as an electrician mate. He worked an eight-hour shift each day maintaining electrical lighting distribution,

---

[1]    Warren Pumps sold pumps to the Navy which included asbestos-containing gaskets and packing. (CCSMF (ECF No. 611) RSP ¶ 49.)

standing watch on a switchboard in the engine rooms, and maintaining all electrical devices on the ship, including lighting, motors, and generators. (CCSMF (ECF No. 611) at ¶ 16; ECF No. 606-2 at 70.) He stood watch four hours per day and then spent the other four hours of his shift doing repair work on electrical systems on the ship. (CCSMF (ECF No. 611) ¶ 48.) While one electrician mate stood watch for four hours, the other electrician mates carried out their assignments throughout various compartments of the ship. (Id.¶ 17.) There was an electrical shop onboard the USS Blue where the electrician's mates performed a lot of their repair work. (CCSMF (ECF No. 611) ¶ 46.) Mr. Gorton, however, worked in every compartment on the ship. (CCSMF (ECF No. 611) ¶ 49.)

### 3.  Mr. Gorton's Work in the Engine Rooms and Boiler Rooms

It was a regular part of Mr. Gorton's duties to go into the engine room and fire room onboard the USS Blue. (ECF No. 606-2 at 20.) Mr. Gorton and the other electricians spent more time in the engine rooms than the aft boiler room or forward boiler room because the switchboards on which the electricians worked were located in the engine rooms. (ECF No. 606-2 at 75.) Mr. Gorton was in the aft engine room and forward engine room every other day or a couple times per week. (Id. at 75-76.) Mr. Gorton was in the aft boiler room and forward boiler room less than a couple times per week, but more than once a month. The electricians were "[c]onstantly replacing light bulbs" in those rooms because the environment in those rooms was "very harsh on electrical equipment." (Id. at 76.) In the boiler rooms, Mr. Gorton worked on and around electrical equipment including level lamps, pump motors, and electrical controllers.

(CCSMF (ECF No. 611) ¶ 50.) While in the engine or fire room, Mr. Gorton cleaned switchboards with chemicals. (CCSMF (ECF No. 611) ¶ 60.)

### 4. Duties of Machinist Mates

Machinist mates performed work in the engine rooms onboard the USS Blue. (ECF No. 606-2 at 17.) Mr. Gorton explained that the machinist mates "would maintain the ship's propulsion system, the evaporators,…water purification system, the reduction hears. They were in charge of all the propulsion system within the engine room." (Id.) Mr. Gorton, as an electrician mate, was responsible for the electrical motors on the pumps located in the engine rooms. The electrical motors were the "driving force that operated the pump." (Id. at 18.) Boiler tenders and fire technicians were assigned to the fire rooms, (Id. at 17-18.)

Machinist mates performed maintenance duties including repairing and replacing components of the pumps. (ECF No. 606-2 at 19.) Machinist mates were responsible for using "[p]acking material…[and] gaskets" to make sure the valves and pumps maintained "the proper seal." (Id.)

Mr. Gorton described the work he witnessed the machinist mates perform on the pumps in his presence:

> [T]hey would disassemble them from the in-line with the steam lines or the water lines…and they would either have a replacement pump available or that section would be isolated to where it would be bypassed until that could be repaired.
> …
> I saw…the gasket material they would have to put between the couplings and the valves.

(ECF No. 606-3 at 33.)

Mr. Gorton could not "recall exactly," but was "sure" the machinist mates removed packing material from the pumps in his presence. He explained:

> [W]hen they disassembled a valve or disassembled a coupling, there was [gasket] material used to seal them, prevent the water leaks or steam leaks, whatever it might be.

(ECF No. 606-3 at 33-33.)

The machinist mates performed the foregoing work in the presence of Mr. Gorton. (Id.) Mr. Gorton was in the vicinity of a machinist mate when they performed work on a pump "every time…[he] had a [four-hour] watch." (Id. at 19-20.) Mr. Gorton explained:

> And then when there was any type of electrical – or electricians needed in that – in that compartment for any type of work, there was at least one or two of us available in the engine or fire room.

(ECF No. 606-2 at 20.)

Machinist mates worked on all the pumps onboard the USS Blue. (ECF No. 606-2 at 50.) Mr. Gorton recalled being present while machinist mates worked on pumps "in general," but did not have a specific recollection about the kinds of pumps on which those machinist mates worked or the manufacturers of the pumps on which the machinist mates worked. (ECF NO. 606-2 at 50-51.) Mr. Gorton assisted machinist mates in taking pumps offline. He did the electrical work himself and assisted them in removal of the pump. He disconnected the electrical motors of the pipes, removed (unbolted) the pipes, and carried the pipes. (ECF No. 595-2 at 56-57.) Mr. Gorton could not recall how often he assisted machinist mates in taking pumps offline. (Id. at 56.)

Mr. Gorton was alongside machinists when they disassembled and scraped the "pieces of the pump[,]" i.e., "when they took it apart, they'd have to scrape the gasket material loose." (CCSMF (ECF No. 611) RSF ¶ 18.)

### 5. Mr. Gorton's Work on the Pumps

Mr. Gorton's work on the pumps onboard the USS Blue was "continuous[,]" i.e., "every day…[he] had one of them that would fail that…[he would] be working on." (ECF No. 606-3 at 40.) There were "a lot" of pumps onboard the USS Blue. (ECF No. 606-3 at 40.) Mr. Gorton could not estimate how many pumps were onboard the USS Blue. (Id.)

Mr. Gorton worked "in conjunction with the machinist that was working on the pump" because the work was "all connected together." (ECF No. 606-3 at 25.) Mr. Gorton performed the electrical portion of the work on the pumps. (Id.) Mr. Gorton explained:

> [I]f there was a line that had asbestos wrapped around those water lines or steam lines, they would be disconnected right in our proximity within a few feet of where we were working.

(ECF No. 606-3 at 25.)

A "controller" or "motor controller" is the switching unit of a pump. (ECF No. 606-3 at 34.) They had buttons on them and contacts inside of them. When a motor controller was turned on, it provided power to the pump, i.e., it was the switch for the pump. (Id.) The motor controllers were comprised, in part, of "Bakelite."[2] Specifically,

---

[2]     As discussed below, Bakelite was used in all the controllers and circuit breakers onboard the USS Blue. Mr. Gorton learned about Bakelite and that it was an asbestos-containing product at the Navy electrician school. (CCSMF (ECF No. 611) RSF ¶ 23.)

the portion of the motor controller where the contacts of the switch inside the termination points were on "Bakelite strips," which were comprised of asbestos. (Id.)

The motor controllers contained asbestos. Mr. Gorton explained:

> Anytime the cable passed through a bulkhead, we would handle a sealing compound made up of asbestos, any type of – in the controllers there was separators between the circuits that were made of asbestos material.

> It produces a lot of heat. Anytime you have electric flow, you have heat. There's a problem with that so it has to be separated by these insulators.

(ECF No. 606-2 at 20-21.)

"[T]here were times" that when the electrician mates were called to a pump to disconnect the pump's power, the electrician mates disconnected the pump's power and "could simply walk away from that pump…." (ECF No. 606-5 at 103.) If the electrician mates needed to work on a motor controller, they would remove it from the pump and "take it either to work on it on the main deck or to the shop." (ECF No. 606-5 at 80.) When work was done on the controllers it created dust that he breathed. He testified that this work was done daily. (CCSMF (ECF No. 611) RSF ¶ 21.) It was a regular part of Mr. Gorton's job to work on controllers and there were always at least one or two malfunctioning controllers on the ship. (CCSMF (ECF No. 611) RSF ¶ 22); ECF No. 606-3 at 38.) Bakelite was used in all the controllers and circuit breakers onboard the USS Blue. Mr. Gorton learned about Bakelite and that it was an asbestos-containing product at the Navy electrician school. (CCSMF (ECF No. 611) RSF ¶ 23.)

The electrician mates and machinist mates or boiler tenders worked "side by side[,]" i.e., within four feet or less of each other, when the machinist mates or boiler tenders were packing and repacking the pumps onboard the USS Blue. (ECF No. 606-2

10

at 23.) Mr. Gorton described the machinist mates or boiler tenders job packing and repacking the pumps as "disassembling the pump[s]." (Id. at 24.) The machinist mates scraped pieces of the pump to loosen the gasket material. (Id.) Mr. Gorton learned that the gasket material was "asbestos-based material." (ECF No. 606-3 at 33-34.) Mr. Gorton knew "at the time" that the packing material and the gasket material were made of asbestos. (ECF No. 606-3 at 167-68.)

The pumps on which Mr. Gorton worked onboard the USS Blue had "a lot" of different names, including: "Pacific," "Buffalo," "Peerless," "Blue Goulds," and "Warren." (ECF No. 606-2 at 22-23.)  Some[3] unspecified pumps had insulation wrapped around them and the insulation was removed from those pumps. (CCSMF (ECF No. 611) ¶ 28.)

Some of the pumps onboard the USS Blue contained insulation, including, but not limited to, steam pipes. (ECF No. 606-2 at 25.) Sometimes the insulation had to be removed from the pipes for work to be performed on the pipes. (Id. at 25.) Mr. Gorton was present when asbestos insulation was removed from those insulation-containing pumps and he breathed the dust created from the removal of the insulation. (Id. at 25.) The removal of the insulation from those pipes created dust, in which Mr. Gorton breathed. (Id. at 25-26.)

---

[3]     When questioned about which equipment onboard the USS Blue had insulation on it, Mr. Gorton responded:

> Some of the pumps, the – the valves were wrapped in it, the fuel lines were wrapped in it. Everything – all the lines, all the pipes  were wrapped with asbestos.

(ECF No. 595-2 at 25.)

Mr. Gorton did not have knowledge about a pump's repair history or how often it was repaired or what those repairs were before he boarded the USS Blue. He did not know if any packing or gasket removed from *any* pump was original to that pump. (CCSMF (ECF No. 611) ¶ 33.)

Mr. Gorton admitted that he did not know how many pumps manufactured by Warren Pumps were on board the USS Blue. (CCSMF (ECF No. 611) ¶ 36.) Mr. Gorton believed the pumps manufactured by Warren Pumps were in the engine rooms and fire rooms of the USS Blue. (CCSMF (ECF No. 611) ¶ 37.) Mr. Gorton did not know what kind of pumps the pumps manufactured by Warren Pumps were, and he could not describe the size of those pumps. (CCSMF (ECF No. 611) ¶ 38.) Mr. Gorton had no information about the purpose or function of a Warren Pump or the systems in which a Warren Pump was used. (CCSMF (ECF No. 611) ¶ 39.)

Mr. Gorton did not have a specific recollection of being around someone performing work on a Warren Pump *when Nall was present.* (ECF No. 606-2 at 88.) Once the electrician mates disconnected the power for a pump, they would not "wait around" while the machinist mates or boiler tender performed repairs on the pump; rather, they would "[g]o do something else." (ECF No. 606-2 at 78.) The electrician mates were present when the machinist mates or boiler tenders accessed the internal components of a pump; indeed, Mr. Gorton recalled being the presence of machinist mates when they replaced bearings and repacked pumps. (Id. at 53.)[4] The electrician mates had to remove gasket material or were "near in the vicinity of someone removing gasket material." (ECF No. 606-2 at 107.)

---

[4]	This testimony all concerns "Peerless" pumps. (ECF No. 606-2 at 54.)

### 6. Duties of the Boiler Tenders

Boiler tenders were responsible for the valves in the fire room and engine rooms on the USS Blue. (ECF No. 606-3 at 32.) Mr. Gorton was present when boiler tenders worked on the valves. (Id.) He explained the boiler tenders' work on the valves as follows:

> A lot of leaks would appear, and they would have to shut some systems down and then replace the gasket material between fittings and or pumps, and then that's when we would be involved as electricians to do the electrical portion.
>
> …
>
> We'd have to shut the power down, and if there was something wrong with the electrical motor, we'd have to remove that and get it sent over to the tender to get it rewound or whatever the need might be. Most of the time it was just water leaks, and the electrical portion was okay, intact.

(ECF No. 606-3 at 33.) The boiler tenders had to remove packing material as part of their jobs because "when they disassembled a valve or dissembled a coupling, there was Gask[et] material used to seal them, prevent the water leaks or steam leaks, whatever it might be." (Id.)

Mr. Gorton worked directly on electrical equipment that contained asbestos and on packing material that he used on electrical cables in order to make a watertight seal. (CCSMF (ECF No. 611) ¶ 30.)

Mr. Gorton encountered thermal pipe insulation when he disconnected pump motors from pumps. (CCSMF (ECF No. 611) ¶ 51.) When the USS Blue went to sea, Mr. Gorton was in the presence of thermal pipe insulation[5] repairs and the dust it created. (CCSMF (ECF No. 611) ¶ 52.)  Mr. Gorton shut the power down to electrically

---

[5]     When an insulated piece of equipment or section of pipe was repaired or maintained, it was necessary to first remove the insulation. (ECF No. 595-2 at 116.)

driven pumps and repaired the motor or allowed the machinist mate to repair the pump.

(CCSMF (ECF No. 611) ¶ 53.)

### 7. The 1961 Overhaul of the USS Blue

In 1961, a yearlong shipyard overhaul of the USS Blue occurred to turn the USS

Blue into an antisubmarine ship. (ECF No. 606-2 at 28; ECF No. 606-3 at 18.) The USS

Blue was placed into dry dock at Hunter Points in San Francisco, California. Mr. Gorton

explained:

> [F]rom the deck – the main deck up was removed, the stacks, the mast, the bridge. All the compartments that were above the deck were taken off the ship.
>
> Down in the engine rooms they overhauled the reduction gears, the propulsion system, re-rerouting fuel lines, steam lines.
>
> We would stand fire watch down in those compartments and that [asbestos] dust was common in all the spaces that we worked in.
> …
> [The asbestos was] [f]rom the fuel lines, the steam lines that were wrapped in the asbestos material. The yard workers were doing – performing the work and we were there for fire watch.

(ECF No. 606-2 at 28; ECF No. 606-3 at 18.) Mr. Gorton described the work he performed

during his eight-hour watches as part of the overhaul as follows:

> When we removed the entire superstructure, our job was to go in there and pull everything electrical out of that – all the compartments, including the bridge.
>
> That had to do with lighting, all the cabling had to be removed, all the motor controllers, any motors, fans, exhaust fans. Everything that was electrical we had to remove before they cut the superstructure off.

(ECF No. 606-2 at 29.) The electrician mates "stood watch down…in the engine rooms"

and also "spent time in the fire rooms, engine rooms, and every compartment on the

ship." (ECF No. 606-3 at 18.)

14

Thompson and Mr. Gorton were exposed to asbestos during the overhaul of the USS Blue. The electrician mates stood fire watches for the civilians on board who were "tearing it all apart" and removing and installing asbestos pipe insulation. (ECF No. 606-5 at 47.) "[I]t was really a dusty, dirty job…." (Id.)

Mr. Gorton was exposed to asbestos dust during the one-year FRAM overhaul of the USS Blue at Hunter's Point Naval Shipyard. As part of the overhaul Mr. Gorton and his fellow electricians removed all electrical equipment from all the compartments on the ship, including all the motors, motor controllers, fans, exhaust fans, and everything electrical. (CCSMF (ECF No. 611) RSF ¶ 11.) Mr. Gorton testified that during the one-year period while the ship was in dry dock, he was present eight hours every day when the civilian contractors tore out all the insulation on the ship and reinstalled new equipment including insulation on all the equipment. (CCSMF (ECF No. 611) RSF ¶ 12.)

### 8.  Packing and Gaskets

The packing and gaskets were supplied to the machinist's mates or boiler technicians by the Navy. (CCSMF (ECF No. 611) ¶ 34.) Mr. Gorton did not observe packing or gaskets that contained asbestos while on the USS Blue. Another person, however, told him that packing or gaskets on board the USS Blue contained asbestos. (CCSMF (ECF No. 611) ¶ 35.)

Mr. Gorton worked with packing material himself. The packing material was "in a rope form and it came packages in…a plastic wrap and…[the electrician mates] would wrap that around the cables or whatever…[they] were trying to seal to make it watertight." (ECF No. 606-2 at 27.) The packing material with which Mr. Gorton worked

was the same packing material that machinist mates and boiler tenders used to pack the valves and pumps. (Id.)

Mr. Gorton was told that the gaskets contained asbestos. (CCSMF (ECF No. 611) ¶ 56.) He testified that the gaskets were manufactured by Owens-Corning and CertainTeed. (CCSMF (ECF No. 611) ¶ 57.)

During the overhaul, Mr. Gorton was frequently a bystander to the removal and installation of thermal pipe insulation, which contained asbestos. (CCSMF (ECF No. 611) ¶ 61.)

Mr. Gorton produced a document to Warren Pumps containing lists of: "Companies worked for[;]" "Work environment[;]" "Elect Equip Suppliers[;]" and "Equip[.]" (ECF No. 595-10.) Warren Pumps is not listed on the document under any of the foregoing categories. (Id.) Mr. Gorton testified that the list was made as support for his 2011 deposition. (ECF No. 595-5 at 7.)

Thompson was deposed in this personal injury case on February 22, 2021. (CCSMF (ECF No. 611) ¶ 67.)  As electricians aboard the *USS Blue*, Thompson and Mr. Gorton worked on 110, 240, and 440 voltage equipment including motor fans, circuit breakers and anything electric, except for communication devices and lines.  (CCSMF (ECF No. 611) ¶ 68.) They encountered and worked around every rating including gunner's mates, machinist's mates, boiler tenders, and the entire crew because they went into every compartment to fix electrical devices.  (CCSMF (ECF No. 611) ¶ 69.) Thompson testified that Mr. Gorton and he were present when machinist's mates worked on pumps.  (CCSMF (ECF No. 611) ¶ 70.) Neither Thompson nor Mr. Gorton worked on any "pump piece of equipment other than the actual motor." (ECF No. 606-5

16

at 117-18.) Thompson did not identify Warren Pumps as a manufacturer of the pumps onboard the USS Blue on which Thompson and Mr. Gorton worked in his deposition testimony or in his affidavit. (ECF No. 606-5 at 24-28; ECF No. 606-4.)

Thompson and Mr. Gorton on an emergency basis, i.e., not with any regularity, had to pull the pumps out of the "line." (ECF No. 606-5 at 70-72.) The electrician mates worked together to pull the pumps out of the line. (Id. at 71.)  [G]enerally," pulling a pipe out of line occurred in port and not while the USS Blue was out at sea. (Id. at 72.)

During Thompson's deposition, he testified that in the engine rooms, there were "all kinds of circulating pumps, fire pumps, fire and flushing pumps, all kinds of electrical pumps down there." (ECF No. 606-5 at 21.)  In the same deposition, he testified that he did not remember "simply a fire pump on the USS Blue." (Id. at 107.)

Thompson and Mr. Gorton worked side by side with machinist mates in the engine rooms. (ECF No. 606-5 at 21.) Thompson explained:

> Down in the machinist mate compartment, we called it the engine rooms, and they would have all kinds of circulating pumps, fire pumps, fire and flushing pumps, all kinds of electrical pumps down there.
>
> And they had mechanical pumps. And whenever a pump or something would go wrong, we would be right there. When they pulled it apart, we would have to disconnect it. And then we would pull the motor out or whatever went wrong [with] it, and repair it and get it back in shape.

(ECF No. 606-5 at 21.) The electrician mates were present when the machinist mates worked on the  pumps. Thompson explained:

> [W]e would generally get a repair or somebody would say that the fire flushing pump number 1 would go out. We would kill the power to it. Meet them down there. We would disconnect the power to it. The[n] they would tear the lines off of it, and we would unbolt the motor and pull it out altogether.

17

(ECF No. 606-5 at 21-22.) Thompson did not recall doing work on any specific

pump manufactured by any specific manufacturer. (ECF No. 606-5 at 77.)

The electrician mates worked on "everything that was electrical that didn't have

anything to do with electronics." (ECF No. 606-5 at 29.)  Thompson explained:

> [W]e would be right there when we disconnected the power from it, pull the lines out. They would unhook the steamlines or the lines going to it. We would pull the motor out and get it out of the engine room or fire room, take it up on the main deck.
>
> If we could repair it, we could. If we had to order a new one or send it to a tender to get it rewound, that's what we would do. They always had a spare – each system had a spare, like if one broke down you could switch the other one.

(ECF No. 606-5 at 30.)

When the machinist mates changed the packing, the electrician mates, e.g.,

Thompson and Mr. Gorton, were "[a]lmost elbow to elbow" with the machinist mates.

The electrician mates "wanted to make sure that they didn't tighten them too much,

or…[the electrician mates] would have a problem with…[their] motor when [they

were]….there." (ECF No. 606-5 at 37.) The electrician mates worked "[a]lmost elbow to

elbow" with the machinist mates when they were changing the packing "maybe every

week or so." (ECF No. 606-5 at 38.) Thompson could not estimate how many pumps

were on the USS Blue. He testified: "I couldn't even estimate. I wouldn't have any idea.

Lots of them." (Id. at 39.) Thompson explained:

> You got to realize that this steel box you're in is a ship. And it's just packed with equipment in there to make it run. And it has a whole bunch of different pumps and motors and stuff like that. And every once in a while, you would have one go out. That's what you would have to fix. And one of them would start leaking and you would have to fix it. You wouldn't do it all the time. It was just once in a while when one went bad.

(ECF No. 606-5 at 38.) Thompson's job onboard the USS Blue did not entail working on the internal components of a pump. (ECF No. 606-5 at 102.)

### D.  The Navy's Procurement of Equipment from Warren Pumps[6]

Navy warships are some of the most complex machines ever designed and constructed. (ECF No. 595-13 ¶ 6.) They are designed to operate effectively in very harsh and hostile environments.  (Id. ¶ 7.)  There has never been any one company within the United States that can design, construct, and deliver a complete Navy warship. The Navy itself had to undertake the design and technical documentation of the complex and warships and develop ways to verify the performance and reliability of the new designs. (Id. ¶ 8.)

During the 1940s, the Bureau of Ships ("BUSHIPS") was a "key organization" within the Navy for the design, procurements, construction and maintenance of Navy ships. (Id. ¶ 10.) BUSHIPS was comprised of a broad assortment of engineers and

---

[6]     Mrs. Gorton points to a "Military Specification Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment" ("Military Specification Manual") in support of its allegation that the Navy required express warnings on equipment provided by manufacturers. As Warren Pumps points out, however, the Military Specification Manual is dated June 6, 1961, and Warren Pumps sold the pumps for use onboard the USS Blue in the 1940s. (ECF No. 606-9 at 2; ECF No. 612-2 ¶ 17.)
      Mrs. Gorton relies upon a deposition of Adam Martin ("Martin"), who in 1983 testified in another asbestos case, had worked as a packaging inspector and specialist at a military supply depot, and was an Action Officer for Military Standard 129. Martin testified that nothing in Military Standard 129 prohibited manufacturers from placing warnings on their products. (ECF No. 606-12 at 20, 29, 30-31.) Warren Pumps argues, among other things, that Military Standard 129 was published in 1951, i.e., nearly ten years after Warren Pumps manufactured pumps for use on USS Blue, and, therefore, Military Standard 129 is not relevant to this case. Mrs. Gorton included "Military Standard Marking for Shipment and Storage," MIL-STD-129B, as Exhibit L in this case. MIL-STD-129B has date of April 10, 1957. MIL-STD-129B superseded MIL-STD-129A, which is dated February 8, 1954. Thus, it appears that Warren Pumps is correct that its manufacture of the pumps for USS Blue predated the military standard upon which Mrs. Gorton relies in this case.

technical personnel and was responsible for all technical aspects of Navy warships. (Id. ¶ 11.) BUSHIPS contracted with industry and other government agencies to procure the required equipment and materials needed to construct and test the Navy's warships. (Id. ¶ 9.) The Navy developed specifications for use in procuring equipment from manufacturers for installation on its ships. (Id. ¶ 16, 21.) The specifications presented very detailed descriptions of what the government mandated when procuring equipment and invoked other specifications.  The detailed descriptions included: (1) chemical composition; (2) dimensions; (3) required testing and performance demonstrations; (4) required labeling; (5) packing and shipping requirements. (Id. ¶ 21.) During the 1930s, 1940s, and early 1950s, the specifications were called General Specifications for Machinery ("GENSPECs"). (Id.¶ 21.)

Equipment installed aboard 1940s destroyers such as the USS Blue (DD-744) was required to meet Navy GENSPECs. (ECF No. 595-13 ¶ 48.) Reciprocating-type pumps were subject to GENSPEC Subsection S47-1 (Reciprocating Pumps, Direct-Acting Steam and Motor Driven) and centrifugal-type pumps were subject to GENSPEC Subsection S47-2 (Centrifugal and Axial Flow Pumps) issued by the Bureau of Engineering of the Navy Department. (Id.) Subsections S47-1 and S47-2 incorporated, in turn, many others, including GENSPEC Subsection S1-1 (Plans). (Id. ¶ 49.) GENSPEC S1-1 is dated March 1, 1941. (ECF No. 595-14 at 46.)

The Navy maintained the responsibility to develop the GENSPECS, "MILSPECS"[7] and other standards for the manufacture and supply of equipment used in the construction, maintenance, and repair of Navy ships. Specifications for any

---

[7]     MILSPECs is not defined in the affidavit.

equipment intended for use aboard Navy ships were drafted, approved, and maintained by the Navy. Once promulgated, only the Navy could make changes or modifications to those specifications. GENSPECS and MILSPECS were prepared by hundreds of Navy engineers highly qualified in specialty areas such as, among many other things, valves, pumps, steam turbines, gas turbines, reduction gears, ship propulsion, electrical systems, and auxiliary equipment. (Id. ¶ 22.)

Manufacturers were required to submit a preliminary detailed drawing describing all aspects of how they intended to fulfil the technical requirements in the Navy's specifications and contract documents. The Navy reviewed and directed modifications to the detailed drawings. (ECF No. 595-13 ¶ 34-35.) Approval by the Navy of the drawings was required prior to manufacturing to ensure that the pumps and accompanying documentation conformed with all government specifications. (Id. ¶ 34-35.) Compliance with the standards and specifications issued for equipment supplied for ultimate use aboard Navy ships was directly monitored by Navy representatives who worked on-site at vendor facilities to exercise primary, front line control and direction over the work performed for the Navy by original equipment manufacturers. (Id. ¶ 42.)

Technical specifications also included detailed requirements regarding all written materials supplied with the components. In addition to drawings and plans, this written material often also included operator reference materials to assist the equipment operators in operating, servicing, and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses.

(ECF No. 595-13 ¶ 36-37.) "Navy personnel or those of the Navy's Design Agents participated intimately in the preparation and review of…instruction books and technical manuals in a standardized format used by the Navy." (ECF No. 595-13 ¶ 37.)

Manufacturers of equipment were required to submit draft manuals to the Navy for detailed review and feedback. (ECF No. 595-13 ¶¶ 37-38.) The Navy's review of preliminary technical manuals often resulted in

> lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings….
>
> …
>
> As a result of this review and approval process, these manuals include safety information to the extent – and only to the extent – directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy.

(ECF No. 595-13 ¶¶ 38-39.) The Navy exercised this level of control over "written communication regarding equipment it procured…to ensure consistency of that information with the overall goals and priorities of the Navy in operations." (ECF No. 595 ¶ 40.) It has been explained:

> Uniformity and standardization of any communication, particularly safety information, are critical to the operation of the Navy and Navy ships. The Navy could simply not operate safely and effectively if personnel were trained differently, using inconsistent information received from different manufacturers. If every equipment, structural steel and pipe manufacturer were allowed to decide on the need for, and provide its own safety and health warnings (including those concerning asbestos insulation that might be used on or around its product), inconsistent warnings would certainly have results. If each were to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances. Therefore, the Navy's detailed specification of and control over what warnings were required, both on equipment and in technical documentation, was logical and necessary.

(ECF No. 595-13 ¶ 41.)

Any pumps, pump packaging and/or manuals that were shipped for installation on a Naval warship would have been supplied pursuant government contract specifications. (ECF No. 595-13 ¶¶ 38, 45, 51b.) "The ultimate confirmation that all specification, standards and contract requirements have been complied with occurs when the Navy accepts the 'product' and authorizes payment…When the Navy accepts and pays for the contracted product this verifies that all contract requirements have been satisfactorily met." (ECF No. 595-13 ¶ 47.)

During the 1940s through 1975, asbestos-containing materials were the most commonly utilized materials for insulation, gaskets and packing for pumps and other machinery and components. Navy pump specifications during this period required the use of compressed asbestos sheet gaskets for sealing pump casings. (ECF No. 606-10 at 14-15.)

Warren Pumps supplied pumps for installation on the USS Blue. (ECF No. 595-13 ¶ 51b.) Warren Pumps' equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications, i.e., the GENSPECs, and contractual requirements. (ECF No. 595-13 ¶ 42.)

The Navy's review and approval processes for pumps supplied to the USS Blue contained multiple layers of review by or on behalf of the Navy. (Id. ¶ 51b.)[8] In other words, Warren Pumps was "required to comply with technical specifications in all details in order for the Navy to accept the equipment." (ECF No. 595-13 ¶ 23.) The pumps

---

[8]     There are two paragraph 51s in Warren Pump's exhibit M. The court considers the first paragraph 51, paragraph 51a and the second paragraph 51, paragraph 51b. (ECF No. 595-13 at 20.)

shipped for installation aboard the USS Blue complied with and were manufactured in accordance with United States government contracts and pursuant to the pertinent Navy GENSPECs. (ECF No. 595-13 ¶ 51b.) The Navy reviewed the preliminary drawings and dictated changes to the design features of the pumps manufactured by Warren Pumps before the Navy approved those design features. (Id.) The Navy's specifications included detailed requirements for testing of equipment to ensure its suitability for the unique environment aboard Navy ships. (Id. ¶ 43.) The Navy, through a series of in-plant and post-delivery inspections and testing, verified that the pumps and documentation delivered to it by Warren Pumps complied in-full with its specifications and conformed to the approved drawings and documentation. (ECF No. 595-13 ¶¶ 38, 45, 51b.) The Navy accepted and approved the manuals for Warren pumps aboard the USS Blue. In other words, the manuals were in full compliance with military specifications. (ECF No. 595-13 ¶ 51b.)

**E. Asbestos-Hazard Knowledge**

As early as 1922, the Navy recognized the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure. (ECF No. 595-15 ¶ 28.) In 1939, the "Annual Report of the Surgeon General of the Navy" (the "Annual Report") addressed the "Hazards of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods." (ECF No. 595-15 ¶ 31.) The Annual Report recognized the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the

24

fabrication shop. (Id.) "[A]t least by the early 1940's, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos dust inhalation exposure." (ECF No. 595-15 ¶ 27.) In the early 1940s, the Navy recognized: (1) a need for the use of respirators, local exhaust ventilation, and wetting of asbestos containing materials to prevent asbestos exposure; (2) the need for medical examinations of personnel exposed to asbestos; (3) asbestos-related disease was a potential hazard of shipyard work; and (4) a need for employee safety training, including training with respect to the use of personal protective equipment. (Id. ¶¶ 32-36.)

By the 1970s, the Navy determined that asbestos posed a potential hazard in the industrial environment and on ships where it was installed. The Navy implemented an aggressive program to implement procedures to protect sailors and anyone else on board. (ECF No. 606-17 at 5.) David P. Sargent, Jr. ("Sargent"), who served as an Admiral in the Navy, testified in a separate lawsuit that he personally was unaware of the dangers of asbestos exposure until the mid to late 1970s. The Navy had determined by then that, in fact, asbestos did pose a potential hazard not just in an industrial environment, but also on-board ships where it was installed. (ECF No. 606-17 at 4.)

Mechanical engineers employed by Warren Pumps were members of the American Society of Mechanical Engineers ("ASME") during "[c]ertain periods of time." (CCSMF (ECF No. 611) RSF ¶ 51; ECF No. 614-1 at 16.) As early as 1933, ASME recognized in an article that asbestos dust was hazardous, and the inhalation of asbestos dust could cause "occupational disabilities." (ECF No. 614-1 at 14.)

An article published in a January 1946 edition of "Southern Power and Industry" provided that "exposure to asbestos is toxic." (ECF No. 614-1 at 25.) A predecessor to

Warren Pumps advertised in the same January 1946 edition of "Southern Power and Industry." (Id. at 23-24.)

According to Roland Doktor, the corporate designee for Warren Pumps, Warren Pumps did not locate and is not aware of any information or evidence to show that Warren Pumps was aware of any potential hazard associated with exposure to asbestos-containing components incorporated into its pumps at any time during the 1940s when Warren Pumps sold its pumps to the Navy for used onboard the USS Blue. (ECF No. 612-2 ¶ 17.)

### F.  Experts

Dr. Howard Kipen ("Kipen") provided an expert report in this matter dated January 23, 2016. Kipen concluded that Mr. Gorton's exposures to asbestos-containing products in the Navy, both as a bystander and his own work, were significant contributing causes to his development of mesothelioma. (CCSMF (ECF No. 611) RSF ¶ 41.) Dr. Richard Kradin ("Kradin") issued an initial report and a supplemental report in this matter. Kradin concluded that Mr. Gorton suffered from diffuse malignant mesothelioma. Kradin further reviewed Mr. Gorton's exposure history to pumps and other equipment and found they were all substantial contributing factors for his mesothelioma. Kradin in his supplemental report detailed and quantified Mr. Gorton's exposure to respirable fibers from various products he was exposed to in the Navy. (CCSMF (ECF No. 611) RSF ¶ 42.)

### III.  Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, must draw all reasonable inferences in favor of the non-moving party, and resolve all doubts in favor of the nonmoving party. Doe v. Cty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

IV.    **Discussion**

A.  **Applicable Law**

In this court's opinion denying the motion for summary judgment filed by then-defendant Eaton Corporation, the court held that pursuant to Federal Rule of Civil Procedure 9(h), Pennsylvania common law applied to the case because there existed multiple bases for this court's jurisdiction over the case and Mrs. Gorton did not elect to invoke the special admiralty rules. As Warren Pumps points out in its motion for summary judgment, this holding was erroneous.[9] Rule 9(h) governs whether special admiralty *procedural* rules will govern a case, e.g., there is no right to a trial by jury in a case governed by the special rules of admiralty. Garczynski v. Rossilli, No. CIV.A. 00-1553, 2002 WL 35072899, at *1 (D.N.J. Apr. 5, 2002).[10] Rule 9(h) does not govern whether the *substantive* maritime law[11] applies to a case. One district court has explained:

---

[9]     The outcome of the court's decision with respect to Eaton's motion for summary judgment would have been the same if the court applied admiralty law rather than Pennsylvania law.

[10]     The court in Garczynski explained:

The most relevant consequence for our purposes of an identification of a claim as an admiralty or maritime claim is that the matter is subject to bench trial. Rule 9(h) "effectively precludes trial by jury for cases in which the court has jurisdiction through admiralty or some other means and the plaintiff identifies the claim as one brought in admiralty, and those in which the court's exclusive jurisdiction is in admiralty." Gaines v. Ampro Fisheries, Inc., 836 F.Supp. 347, 348–49 (E.D.Va.1993). Federal Rule of Civil Procedure 38(e) also provides that "[t]hese rules shall not be construed to create a right to trial by jury of the issues in an admiralty or maritime claim within the meaning of Rule 9(h)." Fed.R.Civ.P. 38(e).

Garczynski v. Rossilli, No. CIV.A. 00-1553, 2002 WL 35072899, at *1 (D.N.J. Apr. 5, 2002).

[11]     One court has explained:

28

The Supreme Court has established a two-part test to determine if a tort claim is an admiralty or maritime claim for jurisdictional purposes: first, the alleged tort must have "occurred on navigable water" or have been "caused by a vessel on navigable water"; and second, " 'the general features of the type of incident involved' " (a) must be of a nature that "has 'a potentially disruptive impact on maritime commerce,' " and (b) must have a general character that "shows 'a substantial relationship to traditional

_____

There are three primary sources of admiralty law. First, under Article (III) of the U.S. Constitution, the judicial power of the United States extends to "all Cases of admiralty and maritime Jurisdiction."…From this grant of power the federal courts have authority to develop a substantive body of law applicable to cases within the admiralty and maritime jurisdiction.…This substantive body of *judge-made* law is known as the general maritime law. As such, the general maritime law of the United States is a component of federal common law that furnishes the rule of decision in admiralty and maritime cases in the absence of preemptive legislation.…

The second primary source of admiralty law arises from Congress' exercise of its constitutional powers under the Admiralty Clause and the Commerce Clause.…Where Congress has enacted legislation, the general maritime law is subordinated either by preemption, or by virtue of having been made to conform and/or comport with such legislation.…

The third primary source of admiralty law is found in the several international conventions in the maritime field.…These conventions regulate the global shipping industry, ensuring the smooth operation of vessels from different nations. This is accomplished by negotiating an international convention on a particular topic, followed by adoption of such agreements through domestic legislation.…The United States is a party to many international conventions.

The general maritime law provides remedies for injuries and damage caused by negligence and intentional misconduct, and in certain cases, without regard to negligence…Since the substantive law applicable in cases of admiralty jurisdiction is federal law,…the federal courts, in the absence of a preemptive statute, are free to fashion federal common law remedies.

Hendricks v. Transportation Servs. of St. John, Inc., No. Civ. 626/1995, 1999 WL 395121, at *4-5 (Terr. V.I. Apr. 26, 1999) (footnotes omitted).

maritime activity.' " <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995) (quoting <u>Sisson v. Ruby</u>, 497 U.S. 358, 363-65, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)).

<u>Vargas v. APL Ltd.</u>, No. 15CV6981ILGRML, 2022 WL 757082, at *5–6 (E.D.N.Y. Mar. 11, 2022).

With respect to the locality test, one district court has explained:

[T]he locality test's focus on the place of the injury suggests that inquiry into the precise location in which the injuries were suffered is necessary. Navy workers…frequently split at least some portion of their time between ships on navigable waters and land. In addition, unlike other torts, asbestos-related disease has a long latency period and plaintiffs often rely on expert testimony that all non-trivial exposures to asbestos contribute to the disease process. <u>See generally</u> <u>Harville</u>, 731 F.2d at 782. Thus, in the case of asbestos-related disease arising from work on or around ships, the Court concludes that the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters.

<u>Conner v. Alfa Laval, Inc.</u>, 799 F. Supp.2d 455, 466 (E.D. Pa. 2011). Here, the allegations are that Mr. Gorton was exposed to Warren Pumps' asbestos-containing pumps while on navigable waters on board the USS Blue and while the USS Blue was in drydock during the overhaul. The locality test is, therefore, satisfied because "some portion of the asbestos exposure occurred on a vessel on navigable waters." <u>Id.</u>

With respect to the first part of the connection test, i.e., the potentially disruptive impact on maritime commerce, the court in <u>Conner</u> explained:

The Court's first task under this test is to determine whether the asbestos exposure Plaintiffs allege had a potentially disruptive impact on maritime commerce when characterizing the incidents generally…<u>See</u> <u>Grubart</u>, 513 U.S. at 534, 115 S.Ct. 1043. In these cases, the incidents can be characterized as exposure to allegedly defective products on or around Navy ships. Viewed in this light, the Court concludes that the incidents plainly had a potentially disruptive impact on maritime commerce as to the

injured parties in <u>Conner</u>, <u>Prange</u>, and <u>Stone</u>. All three, after all, served aboard Navy vessels that routinely sailed and docked on navigable waters…They were effectively sailors, whose job was to maintain equipment that was integral to the functioning of the ships on which they served. <u>See</u> <u>Tritt v. Atl. Richfield Co.</u>, 709 F.Supp. 630, 632 (E.D.Pa.1989). Under such circumstances, exposure to defective products could "potentially slow or frustrate the work being done on the vessel." <u>Jones</u>, 650 S.E.2d at 854.

Indeed, exposure to defective products creates unsafe working conditions that could cause labor shortages on the ships due to injuries sustained aboard. <u>See</u> <u>Lambert</u>, 70 F.Supp.2d at 884. And a shortage of this nature "could be exacerbated by fear of exposure by crew members and potential crew members alike."….<u>Id.</u> Any such occurrence would disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so.

Moreover, the allegedly defective products in these cases were often insulated with asbestos or incorporated with asbestos-containing component parts to prevent fires aboard ships. <u>See</u> <u>Johns–Manville Corp. v. United States</u>, 855 F.2d 1571, 1571 (Fed.Cir.1988) ("Due to the heat resistant and fire retardant properties of asbestos it was used in insulating ships' boilers, steam pipes, pumps, and other equipment."); <u>Tritt</u>, 709 F.Supp. at 632. Fire, as the Supreme Court recognized in <u>Sisson</u>, is "one of the most significant hazards facing commercial vessels." <u>Sisson</u>, 497 U.S. at 362, 110 S.Ct. 2892. With fewer workers available to work with equipment in which asbestos was used for heat resistance, a fire could erupt and disrupt commercial vessels. <u>See</u> <u>id.</u> at 363, 110 S.Ct. 2892.

<u>Conner</u>, 799 F. Supp. 2d at 467–68. Based upon the foregoing, the first part of the connection test is satisfied here because the undisputed evidence of record shows that Mr. Gorton was an electrician onboard the USS Blue and was responsible for maintaining the electrical equipment onboard the ship. Under those circumstances, his exposure to Warren Pumps' alleged defective products had the potential to disrupt maritime commerce.

With respect to the second part of the connection test, i.e., the substantial relationship to traditional maritime activity, the court in <u>Conner</u> explained:

> The Court's role in this regard is to assess whether the "tortfeasor's activity ... is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." <u>Grubart</u>, 513 U.S. at 539–40, 115 S.Ct. 1043. Viewing the activity generally as the Court must, <u>see</u> <u>Sisson</u>, 497 U.S. at 364, 110 S.Ct. 2892, the Court finds that the activity engaged in by the numerous defendants in these cases was the manufacture of products for use on vessels.

> Indeed, unlike the asbestos manufacturers who were defendants in many of the prior cases deciding whether maritime jurisdiction applies to asbestos products liability claims, <u>see</u> <u>supra</u> Part III.B.1, the products manufactured in these cases—turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps—were essential for the proper functioning of ships and made for that purpose. The Court therefore concludes that their allegedly defective production bears a substantial relationship to traditional maritime activity. <u>See</u> <u>Jones</u>, 650 S.E.2d at 855 (holding the substantial relationship prong of the connection test was satisfied because the defendant's products were produced and advertised for the marine industry).

<u>Conner</u>, 799 F. Supp. 2d at 469. Here, the undisputed evidence of record shows that Warren Pumps manufactured the pumps at issue for the specific used by the Navy onboard the USS Blue. Thus, the second part of the connection test is also satisfied.

Based upon the foregoing, while Mrs. Gorton did not invoke the special admiralty *procedural* rules in her complaint, the substantive maritime law is applicable to this case.

### B.  Government Contractor Defense with respect to the claims for Product Liability, Breach of Implied Warranty, and Negligence

In <u>Koutsoubos v. Boeing Vertol, Division of Boeing Co.</u>, 755 F.2d 352 (3d Cir. 1985), a case arising under admiralty law, the Third Circuit Court of Appeals recognized the government contractor defense as a "federal common law…defense to liabilities

incurred in the performance of government contracts." Id. at 355. The court of appeals explained that—"in cases involving products developed specially for the military that are alleged to be defectively designed"—the government contractor defense has the following three elements:

> (1) the government established the specifications for the alleged defective product;
>
> (2) the allegedly defective product met the government's specifications in all material respects; and
>
> (3) the government knew as much as or more than the defendant about the hazards of the product.

Id. at 354 (citing In re "Agent Orange" Prod. Liab. Litig., 534 F.Supp. 1046 (E.D.N.Y.1982)).

In Boyle v. United Technologies Corporation, 487 U.S. 500, 512 (1987), the Supreme Court of the United States, in a diversity jurisdiction case arising under Virginia law, addressed the federal common law government contractor defense. The Third Circuit Court of Appeals has explained the import of Boyle as follows:

> In Boyle, the Supreme Court held that before resort is made to state law in a diversity case that involves the application of the government contractor defense to a military contractor, it is necessary to determine whether state tort law is in significant conflict with the federal interests associated with federal procurement contracts. See 487 U.S. at 507–09, 108 S.Ct. at 2515–16. If such a significant conflict is found to exist, state tort law is pre-empted and the government contractor defense as defined by federal law will apply. See id. at 512, 108 S.Ct. at 2518.

Maguire v. Hughes Aircraft Corp., 912 F.2d 67, 69–70 (3d Cir. 1990). The Court in Boyle set forth three elements a defendant being sued for design defects in military equipment must prove to be entitled to the government contractor defense:

(1) the United States approved reasonably precise specifications;

33

(2) the equipment conformed to those specifications; and

(3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Boyle, 487 U.S. at 512.[12]

As noted above, Boyle was a diversity jurisdiction case arising under Virginia state law. The Court's explanation of the federal contractor defense, however, was a statement of federal common law, which applies to, among others, cases arising under admiralty law. See William C. Buckhold & Lisa D. Goekjian, The Government Contractor's Defense to Product Liability Claims, 99 Com. L.J. 64, 85 (1994) ("The government contractor defense is as much a part of federal law as the common law of

_____

[12]   The Third Circuit Court of Appeals has explained Boyle impact on its decision in Koutsoubos as follows:

> Prior to Boyle, courts generally considered Feres to be the source of the government contractor defense. See, e.g., Koutsoubos v. Boeing Vertol, Div. of Boeing Co., 755 F.2d 352, 354 (3d Cir.), cert. denied, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); McKay v. Rockwell Int'l Corp., 704 F.2d 444, 449 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). In Boyle, however, the Court explicitly rejected Feres as the basis for the defense, reasoning that the Feres doctrine is too broad because it would render contractors immune for injuries caused by any standard equipment purchased by the government, and too narrow because it would permit state regulation of military decisions through tort actions brought by civilians. Boyle, 487 U.S. at 510–11, 108 S.Ct. at 2517–18. Instead of relying on Feres, which applies only to torts arising out of military service, the Court instead relied on the discretionary function exception of the FTCA, which applies to government action in both military and nonmilitary matters.

Carley v. Wheeled Coach, 991 F.2d 1117, 1121, 28 V.I. 310, 317–18 (3d Cir. 1993).

admiralty or the statutory liability provisions of the Death on the High Seas Act or Suits in Admiralty Act. Moreover, the basis for the defense, the exercise of discretion by federal officials, is a bar to tort liability under state or federal law."). The government contractor defense as explained by the Court in Boyle, therefore, applies to cases arising under admiralty law like the instant action filed by Mrs. Gorton against Warren Pumps.[13]

With respect to failure to warn claims, one district court recently explained:

> [T]he first prong of Boyle is altered to preclude liability where the government exercised discretion and approved the warnings. See Tate v. Boeing Helicopters, 55 F.3d 1150, 1157 (6th Cir. 1995). Courts require the government approval to "transcend rubber stamping" for the defense to shield a government contractor from liability for failure to warn. Id. at 1156–5. The choice of equipment-related warnings involves exercises of governmental discretion in the same way as does the selection of equipment design. See Jurzec v. American Motors Corp., 856 F.2d 1116, 1118-19 (8th Cir. 1988); Myslakowski v. U.S., 806 F.2d 94, 97-98 (6th Cir. 1986), cert. denied, 480 U.S. 948 (1987); Nicholson v. United Techs. Corp., 697 F. Supp. 598, 604 (D. Conn. 1988). As Tate observed, "[w]hen the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects ... Similarly, when the government exercises its discretion and approves warnings intended for users, it has an interest in

---

[13]     The court in Elorreaga v. Rockwell Automation, Inc., Civ. A. No. 21-5696, 2023 WL 2769146, at *3 (N.D. Cal. Mar. 31, 2023), held that the general contractor defense set forth in Boyle does not apply to cases like the instant action that arise under admiralty law. The court explained that the Ninth Circuit Court of Appeals recognized "that Boyle is premised on preemption concerns that do not exist where….claims are brought under federal law." Id. at *5. As explained above, however, Boyle recognized the general contractor defense as a federal common law defense. Admiralty law applies the federal common law. Under those circumstances, the court does not find Elorreaga persuasive. The court finds the court in Elorreaga was mistaken about the law, and, in any event, the holding of that case contradicts the Third Circuit Court of Appeals' recognition of the government contractor defense in Koutsoubos, 755 F.2d at 355, which arose under admiralty law.

insulating its contractors from state failure to warn tort liability." <u>Tate</u>, 55 F.3d at 1157 (citing <u>Boyle</u>, 487 U.S. at 511-12).

<u>Hilster v. Air & Liquid Sys. Corp.</u>, No. 2:20-CV-01537-MJH, 2022 WL 1720321, at *5–6 (W.D. Pa. May 27, 2022). The general contractor defense will apply to bar product liability claims based upon the defendant's failure to warn when the following three elements are satisfied:

> (1) the United States exercised its discretion and approved the warnings, if any;

> (2) the contractor provided warnings that conformed to the approved warnings; and

> (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not."

<u>Id.</u> at *6.

"The government contractor defense as explained in <u>Boyle</u> applies to strict liability, negligence, and breach of warranty claims arising out of design or manufacturing defects." <u>Lofgren v. Polaris Indus. Inc.</u>, No. 3:16-CV-02811, 2021 WL 2580047, at *4 n.22 (M.D. Tenn. June 23, 2021) (citing decisions). The government contractor defense also applies to product liability claims based upon allegations that the defendant failed to warn others about the dangers of its product, including claims based upon allegations that the defendant negligently failed to warn others about the dangers of its product. <u>Id.</u>

Here, Mrs. Gorton asserts claims for product liability, breach of warranty, and negligence based upon Warren Pumps' defective design of its pumps supplied to the Navy for used onboard the USS Blue. Mrs. Gorton also asserts product liability and

negligence claims based upon Warren Pumps' alleged failure to warn others about the dangers of its pumps supplied to the Navy for use onboard the USS Blue. The court, therefore, will consider whether Warren Pumps is entitled to summary judgment with respect to each of those sets of claims.

### 1. Product Liability, Breach of Implied Warranty, and Negligence Design Claims

#### a. Whether the United States approved reasonably precise specifications

The undisputed evidence of record shows that:

- the Navy developed specifications for use in procuring equipment from manufacturers for installation on its ships, i.e., GENSPECS, (ECF No. 595-13 ¶ 16, 21);

- the specifications presented very detailed descriptions of what the government mandated when procuring equipment and invoked other specifications. The detailed descriptions included: (1) chemical composition; (2) dimensions; (3) required testing and performance demonstrations; (4) required labeling; (5) packing and shipping requirements (id. ¶ 21);

- the Navy maintained the responsibility to develop the GENSPECS, "MILSPECS" and other standards for the manufactured and supply of equipment used in the construction, maintenance and repair of Navy ships (id. ¶ 22);

- specifications for any equipment intended for use aboard Navy ships were drafted, approved and maintained by the Navy (id.);

- once promulgated, only the Navy could make changes or modifications to those specifications (id.);

- GENSPECS and MILSPECS were prepared by hundreds of Navy engineers highly qualified in specialty areas such as, among many other things, valves, pumps, steam turbines, gas turbines, reduction gears, ship propulsion, electrical systems and auxiliary equipment (id.)

- manufacturers were required to submit a preliminary detailed drawing describing all aspects of how it intended to fulfil the technical requirements in the Navy's specifications and contract documents (ECF No. 595-13 ¶ 34-35);

- the Navy reviewed and directed modifications to the detailed drawings (id.);

- approval by the Navy of the drawings was required prior to manufacturing to ensure that the pumps and accompanying documentation conformed with all government specifications (id. ¶ 34-35); and

- the Navy's review and approval processes for pumps supplied to the *USS Blue* contained multiple layers of review by or on behalf of the Navy. (id. ¶ 51b.)

Mrs. Gorton did not adduce any evidence to create a material dispute of fact with respect to whether the Navy approved reasonably precise specifications for the manufacture of pumps onboard the USS Blue. Under those circumstances, a trier could only find that—with respect to Mrs. Gorton's product defect claims—the Navy approved reasonably precise specifications for the manufacture of the pumps supplied by Warren Pumps onboard the USS Blue.

### b.  Whether the equipment conformed to those specifications

Warren Pumps adduced evidence to show its pumps could not have been installed aboard Navy vessels, e.g., the USS Blue, unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications, i.e., the GENSPECs, and contractual requirements. (ECF No. 595-13 ¶ 42.) Under those circumstances, that the USS Blue contained pumps manufactured by Warren Pumps is circumstantial evidence that those pumps confirmed to the Navy's reasonably precise specifications. Hilster, 2022 WL 1720321, at *6 (explaining that this factor was satisfied by the exact evidence presented in this case, i.e., the affidavit from David P. Sargent ("Sargent"), retired Navy Rear Admiral, which provides that pumps manufactured by Warren Pumps would not have been accepted and utilized onboard a Navy vessel unless they complied with the Navy's reasonably precise specifications). Mrs. Gorton did not adduce any evidence to create a triable issue of fact with respect to whether the

pumps manufactured by Warren Pumps and used onboard the USS Blue by the Navy

conformed with the Navy's reasonably precise specifications.

### c. Whether the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States

Warren Pumps does not argue or adduce any evidence to show that it warned

the Navy about the dangers of asbestos in its pumps supplied to the Navy; rather,

Warren Pumps argues that the Navy's knowledge of the hazards of asbestos was

superior to its knowledge of the hazards of asbestos exposure.

Warren Pumps adduced the following evidence about the Navy's knowledge

about the hazards of asbestos at the time it worked with the Navy to manufacture the

pumps used onboard the USS Blue, i.e., in the 1940s:

- as early as 1922, the Navy recognized the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure (ECF No. 595-15 ¶ 28);

- in 1939, the "Annual Report of the Surgeon General of the Navy" (the "Annual Report") addressed the "Hazards of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods" (ECF No. 595-15 ¶ 31);

- the Annual Report recognized the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the fabrication shop (id.)

- "[a]t least by the early 1940's, the Navy had become a leader in the field of occupational medicine relation to, among other things, asbestos dust inhalation exposure." (ECF No. 595-15 ¶ 27);

- in the early 1940s, the Navy recognized: (1) a need for the use of respirators, local exhaust ventilation, and wetting of asbestos containing materials to prevent asbestos exposure; (2) the need for medical examinations of personnel exposed to asbestos; (3) asbestos-related disease was a potential hazard of shipyard work; and (4) a need for employee safety training,

including training with respect to the use of personal protective equipment (id. ¶¶ 32-36); and

- by the 1970s, the Navy determined that asbestos posed a potential hazard in the industrial environment **_and_** on ships where it was installed. At that time, the Navy implemented an aggressive program to implement procedures to protect sailors and anyone else on board (ECF No. 606-17 at 5).

With respect to Warren Pump's knowledge about the hazards of asbestos

exposure, there is no evidence of record to show that Warren Pumps was aware of any

potential hazard associated with exposure to asbestos-containing components

incorporated into its pumps at any time during the 1940s when Warren Pumps sold its

pumps to the Navy for used onboard the USS Blue. (ECF No. 612-2 ¶ 17.) Mrs.

Gorton[14] relies upon the following to show that Warren Pumps' knowledge of the

---

[14]    Mrs. Gorton relies upon an affidavit by Lawrence Stilwell Betts ("Betts") from a different lawsuit for the proposition that "[p]rior to the 1970's the U.S. Navy was unaware of the hazards posed by asbestos[; indeed,] the proven association of asbestos and mesothelioma was not established until the work of Selikoff and his associates in 1972." (CCSMF (ECF No. 611) RSF ¶ 46.) Mrs. Gorton also relies upon the deposition of Roger B. Horne ("Horne"), who formally served in the Navy, from a different lawsuit in which he testified that prior to approximately 1968, the Navy did not recognize the significance of the problem posed by asbestos exposure or that it could lead to the development of cancer. (CCSMF (ECF No. 611) ¶ 47.) Warren Pumps objects to Mrs. Gorton's reliance upon Betts' affidavit and Horne's deposition because Mrs. Gorton did not disclose those individuals as witnesses in this case. (Id. ¶¶ 46-47.) Warren Pumps argues that Mrs. Gorton's reliance upon Betts' affidavit and Horne's deposition is improper because Mrs. Gorton did not disclose either individual as a witness or expert witness in this case.

Even if consideration of this evidence was proper (despite Warren Pumps' representations that Mrs. Gorton did not disclose Betts or Horne as witnesses or expert witnesses in this case), Mrs. Gorton did not adduce evidence sufficient to create a triable issue of fact about Warren Pumps' knowledge about the dangers of asbestos during the relevant time. Under those circumstances, a reasonable trier of fact could not find that—even if the Navy was unaware of the dangers of asbestos during the relevant time—Warren Pumps' knew about the dangers of asbestos during the relevant time period, i.e., Warren Pumps' knowledge concerning the dangers of asbestos was superior to the Navy's knowledge concerning the dangers of asbestos during the relevant time. The court need not, therefore, determine whether Mrs. Gorton's reliance upon Betts' affidavit and Horne's deposition is proper.

hazards of asbestos exposure was superior to the Navy's knowledge of asbestos exposure:

- mechanical engineers employed by Warren Pumps were members of ASME "at certain times" and in 1933, ASME published an article recognizing that asbestos dust was hazardous, and the inhalation of asbestos dust could cause "occupational disabilities" (ECF No. 614-1 at 14);
- an article published in a January 1946 edition of "Southern Power and Industry" provided that "exposure to asbestos is toxic" and a predecessor to Warren Pumps advertised in the same January 1946 edition of "Southern Power and Industry" (ECF No. 614-1 at 23-24).

At best, the foregoing evidence that Warren Pumps should have known that in certain circumstances, exposure to asbestos was hazardous. The foregoing evidence does not, however, raise a triable issue of fact with respect to what Warren Pumps actually knew at the time it manufactured and sold pumps to the Navy for use onboard the USS Blue. Getz v. Boeing Co., 654 F.3d 852, 866 (9th Cir. 2011) ("Boyle…does not require a contractor to warn about dangers of which it merely should have known"). Significantly, the undisputed evidence of record does not show that Warren Pumps' knowledge was superior to the Navy's knowledge about the danger of asbestos used in its pumps sold to the Navy for use onboard the USS Blue. Warren Pumps, therefore, was not required to warn the Navy about those dangers to be entitled to the government contractor defense.

### d. Conclusion with respect to product defect claims

Warren Pumps satisfied its summary judgment burden to show that based upon the undisputed evidence of record, it is entitled to the government contractor defense with respect to Mrs. Gorton's product defect claims.  The motion for summary judgment will be granted with respect to Mrs. Gorton's claims for product liability, breach of implied warranty, and negligent design.

## 2.  Product Liability for Failure to Warn and Negligent Failure to Warn

### a.  Whether the United States exercised its discretion and approved warnings

There is no evidence of record to show that any of the pumps supplied by Warren Pumps to the Navy for use onboard the USS Blue contained any warnings with respect to the hazards of asbestos exposure, whether on the pumps or in manuals accompanying the pumps. Warren Pumps argues that the Navy—in an effort to maintain uniformity and consistency within its "vast organization"—exercised its discretion to control and approved "the content of all written materials accompanying pumps[,]" including "any label plates affixed to [the pumps[.]" (ECF No. 595 at 11.) Warren Pumps relies upon the following evidence in support of that argument:

– the Navy developed specifications for use in procuring equipment from manufacturers for installation on its ships (ECF No. 595-13 at 16, 21);

– the specifications presented very detailed descriptions of what the government mandated when procuring equipment and invoked other specifications.  The detailed descriptions included: (1) chemical composition; (2) dimensions; (3) required testing and performance demonstrations; (4) required labeling; (5) packing and shipping requirements (id. ¶ 21);

– Warren Pumps' equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications, i.e., the GENSPECs, and contractual requirements (ECF No. 595-13 ¶ 42);

– the Navy maintained the responsibility to develop the GENSPECS, "MILSPECS"[15] and other standards for the manufactured and supply of equipment used in the construction, maintenance and repair of Navy ships (id. ¶ 22);

– specifications for any equipment intended for use aboard Navy ships were drafted, approved and maintained by the Navy (id.);

---

[15]     MILSPECs is not defined in the affidavit.

–   once promulgated, only the Navy could make changes or modifications to those specifications (id.);

–   GENSPECS and MILSPECS were prepared by hundreds of Navy engineers highly qualified in specialty areas such as, among many other things, valves, pumps, steam turbines, gas turbines, reduction gears, ship propulsion, electrical systems and auxiliary equipment (id. ¶ 22);

–   Warren Pumps supplied pumps for installation on the *USS Blue* (ECF No. 595-13 ¶ 51b);

–   Warren Pumps was "required to comply with technical specifications in all details in order for the Navy to accept the equipment." (ECF No. 595-13 ¶ 23);

–   technical specifications included detailed requirements regarding all written materials supplied with the components. In addition to drawings and plans, this written material often also included operator reference materials to assist the equipment operators in operating, servicing, and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses (ECF No. 595-13 ¶ 36-37);

–   "Navy personnel or those of the Navy's Design Agents participated intimately in the preparation and review of…instruction books and technical manuals in a standardized format used by the Navy" (ECF No. 595-13 ¶ 37);

–   manufacturers of equipment were required to submit draft manuals to the Navy for detailed review and feedback (ECF No. 595-13 ¶¶ 37-38);

–   the Navy's review of preliminary technical manuals often resulted in lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings (ECF No. 595-13 ¶¶ 38-39);

–   as a result of this review and approval process, these manuals include safety information to the extent – and only to the extent – directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy (id.);

–   the Navy exercised this level of control over "written communication regarding equipment it procured…to ensure consistency of that information with the overall goals and priorities of the Navy in operations." (ECF No. 595 ¶ 40); and

– uniformity and standardization of any communication, particularly safety information, are critical to the operation of the Navy and Navy ships. The Navy could simply not operate safely and effectively if personnel were trained differently, using inconsistent information received from different manufacturers. If every equipment, structural steel and pipe manufacturer were allowed to decide on the need for, and provide its own safety and health warnings (including those concerning asbestos insulation that might be used on or around its product), inconsistent warnings would certainly have results. If each were to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances. Therefore, the Navy's detailed specification of and control over what warnings were required, both on equipment and in technical documentation, was logical and necessary (ECF No. 595-13 ¶ 41).

In an effort to create a triable issue of fact with respect to whether Warren Pumps is entitled to the government contractor defense with respect to Mrs. Gorton's failure to warn claims, specifically with respect to whether the Navy exercised its discretion with respect to warnings accompanying the pumps supplied by Warren Pumps, Mrs. Gorton relies upon a deposition of Adam Martin ("Martin"), who in 1983 testified in another asbestos case that he had worked as a packaging inspector and specialist at a military supply depot, and was an Action Officer for Military Standard 129. Martin testified that nothing in Military Standard 129 prohibited manufacturers from placing warnings on their products. (ECF No. 606-12 at 20, 29, 30-31.) Mrs. Gorton argues that that the Navy not only permitted, but expressly required, warnings on equipment provided to the Navy by manufacturers. (ECF No. 670 at 11.) Even if Mrs. Gorton's readings of the MILSPECS is correct, the MILSPECS upon which Mrs. Gorton relies were issued or became effective *after* Warren Pumps manufactured the pumps at issue in this case in the 1940s. MIL-STD-129B is dated April 10, 1957. MIL-STD-129B, which superseded MIL-STD-129A, is dated February 8, 1954.

44

Mrs. Gorton also cites to SeaNav 6260.005, which was issued in 1956, and MIL-C-2212, which was first published in 1957. Those military standards and regulations became effective *after* Warren Pumps manufactured the pumps in issue in this case for their use by the Navy onboard the USS Blue. Warren Pumps adduced evidence to show that its pumps at issue in this case were built pursuant to GENSPEC Subsection S1-1, Section A1 (General Requirements), GENSPEC Subsection S47-1, and GENSPEC Subsection S47-2. S1-1 is dated March 1, 1941.

Based upon the foregoing, Mrs. Gorton did not adduce evidence to create a triable issue of fact with respect to whether the Navy exercised discretion with respect to the issuance of warnings on the pumps supplied to the Navy by Warren Pumps. The undisputed evidence of record shows that the Navy approved reasonably precise specifications with respect to the manufacturing of the pumps supplied by Warren Pumps, which included a careful review, control, and approval of all written material accompanying the pumps.

### b. Whether Warren Pumps provided warnings that conformed to the approved warnings

Warren Pumps adduces the following evidence of record to show that the pumps it supplied to the Navy for use on board the USS Blue, including all written material included with the pumps, conformed to the reasonably precise specifications issued by the Navy:

- Warren Pumps' equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications, i.e., the GENSPECs, and contractual requirements (ECF No. 595-13 ¶ 42);

- Warren Pumps was "required to comply with technical specifications in all details in order for the Navy to accept the equipment." (ECF No. 595-13 ¶ 23.)

45

– "The ultimate confirmation that all specification, standards and contract requirements have been complied with occurs when the Navy accepts the 'product' and authorizes payment…When the Navy accepts and pays for the contracted product this verifies that all contract requirements have been satisfactorily met." (ECF No. 595-13 ¶ 47.)

– the Navy accepted and approved the manuals for Warren pumps aboard the *USS Blue* and therefore the manuals were in full compliance with military specifications (ECF No. 595-13 ¶ 51b).

In response, Mrs. Gorton argues that whether Warren Pumps conformed to the Navy's reasonably precise specifications with respect to warnings is a triable issue of fact because MIL-STD-129 required Warren Pumps to issue warnings with respect to its pumps, and Warren Pumps did not issue any warnings with respect to those pumps. According to Mrs. Gorton, the Navy's acceptance of the pumps does not show that Warren Pumps complied with the Navy's reasonably precise specifications. As described above, however, MIL-STD-129 post-dated Warren Pumps' manufacture of the pumps at issue in this case, and, therefore, whether Warren Pumps complied with that MILSPEC with respect to the pumps at issue is not relevant to whether Warren Pumps is entitled to summary judgment based upon the government contractor defense.

Based upon the foregoing, the undisputed evidence of record shows that the pumps supplied to the Navy by Warren Pumps, including the written material accompanying the pumps, conformed to the reasonably precise specifications approved by the Navy.

  **c. Whether Warren Pumps warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not**

As discussed above, a reasonable trier of fact could not find that Warren Pumps' knowledge was superior to the Navy's knowledge about the dangers of the asbestos used in the pumps Warren Pumps supplied to the Navy for use onboard the USS Blue.

### d. Conclusion with respect to failure to warn claims

Warren Pumps adduced evidence to show that: (1) the Navy exercised discretion with respect to the written materials accompanying and placed on the pumps supplied by Warren Pumps for use onboard the USS Blue, i.e., the Navy approved reasonably precise specifications with respect to the written materials accompanying those pumps; (2) Warren Pumps conformed to the Navy's requirements with respect to those written materials; and (3) Warren Pumps' knowledge was not superior to the Navy's knowledge about the dangers of the asbestos used in the pumps Warren Pumps supplied to the Navy for use onboard the USS Blue.  Mrs. Gorton did not adduce any evidence to create a triable issue of fact with respect to these issues. Under those circumstances, Warren Pumps is entitled to summary judgment with respect to Mrs. Gorton's failure to warn claims based upon its entitlement to the government contractor defense. The motion for summary judgment will be granted on that basis with respect to Mrs. Gorton's product liability claims for failure to warn and negligent failure to warn.

### C. Fraudulent Concealment

Having concluded that the undisputed facts of record show that Warren Pumps is entitled to summary judgment based upon the government contractor defense with respect to Mrs. Gorton's claims for product liability (defect and failure to warn), breach of implied warranty, and negligence, the only claim remaining in the case is the claim for fraudulent concealment.

47

"Federal courts sitting in admiralty apply the general maritime law as developed by the federal courts proceeding 'in the manner of [ ] common law court[s].'" <u>Blank River Servs., Inc. v. Towline River Serv., Inc.</u>, 395 F. Supp. 3d 589, 604 (W.D. Pa. 2019) (quoting <u>The Dutra Grp. v. Batteron</u>, —— U.S. ——, 139 S. Ct. 2275, 2278, 204 L.Ed.2d 692 (2019)). When admiralty law is silent with respect to the law of a claim, courts look to state law. <u>Wheelings v. Seatrade Groningen, BV</u>, 516 F. Supp. 2d 488, 497 (E.D. Pa. 2007) ("State law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with federal maritime law."). Here, the parties agree that to the extent admiralty does not apply to a claim in this case, Pennsylvania law is applicable. Under Pennsylvania law, the elements of fraudulent concealment are:

(1)   (a) A misrepresentation or

(b) A concealment;

(2)   Which is material to the transaction at hand;

(3)   (a) Made with knowledge of its falsity or recklessness as to whether it is true or false (for a misrepresentation), or

(b) Calculated to deceive (for a concealment);

(4)   With the intent of misleading another into relying on it;

(5)   Justifiable reliance on the misrepresentation; and

(6)   A resulting injury proximately caused by such reliance.

<u>SodexoMAGIC, LLC v. Drexel Univ.</u>, 24 F.4th 183, 205 (3d Cir. 2022).

As discussed above, the undisputed evidence of record shows that Warren Pumps did not possess knowledge about the dangers of the asbestos-containing pipes it supplied to the Navy for use onboard the USS Blue that was superior to the knowledge of the Navy

with respect to those asbestos-containing pipes. Under those circumstances, a reasonable trier of fact could not find that Warren Pumps concealed from the Navy any information about the dangers of asbestos that was material to any transaction identified by Mrs. Gorton. Warren Pumps, therefore, is entitled to summary judgment with respect to Mrs. Gorton's claim for fraudulent concealment.[16]

---

[16]    Warren Pumps in its motion for summary judgment does not specifically argue that it is entitled to summary judgment with respect to the fraudulent concealment claim because there is no evidence of record to show that Warren Pumps concealed from the Navy any information about the dangers of asbestos when it sold to the Navy the asbestos-containing pumps for use onboard the USS Blue. The Third Circuit Court of Appeals has explained:

> District courts have "the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex, 477 U.S. at 326; Fed. R. Civ. P. 56(f). Notice is sufficient if the party "had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 223 (3d Cir. 2004) (citation omitted); see also Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 223 (3d Cir. 2009) (requiring a court to give "notice of its intention to consider granting summary judgment so that [the parties] have an opportunity to marshal evidence on the motion").

Vanhook v. Cooper Health Sys., No. 21-2213, 2022 WL 990220, at *4 (3d Cir. Mar. 31, 2022). Here, Mrs. Gorton knew this court was going to decide whether there was evidence of record to show that Warren Pumps knew about the dangers of asbestos when it sold pumps to the Navy for used onboard the USS Blue and that Warren Pumps' knowledge of the danger of asbestos was superior to the Navy's knowledge of the dangers of asbestos because Warren Pumps argued in its motion for summary judgment that it is entitled to the government contractor's defense because, among other things, the evidence of record does not show that it's knowledge about the dangers of asbestos was greater than the Navy's knowledge about the danger of asbestos when Warren Pumps sold the Navy pumps for use onboard the USS Blue. Under those circumstances, Mrs. Gorton had the opportunity to produce all her evidence with respect to those issues. Mrs. Gorton failed to adduce evidence to create a triable issue of fact about whether Warren Pumps was aware of the danger of asbestos at the time it sold the pumps to the Navy for use onboard the USS and whether Warren Pumps' knowledge about the dangers of asbestos was superior to the Navy's knowledge about the dangers of asbestos during the

**D.  Other Arguments made by Warren Pumps**

Having concluded that—based upon the undisputed evidence of record—a reasonable trier of fact could not find in Mrs. Gorton's favor with respect to the fraudulent inducement claim and that a reasonable trier of fact could only find that Warren Pumps is entitled to the government contractor defense with respect to Mrs. Gorton's other claims, the court need not address the other arguments raised by Warren Pumps in its motion for summary judgment.

**V.      Conclusion**

For the reasons set forth in this opinion, Warren Pumps' motion for summary judgment will be granted and judgment will be entered in its favor with respect to all claims. An appropriate order and judgment will be entered.

**BY THE COURT**,

Dated: June 6, 2023                         **/s/ JOY FLOWERS CONTI**
                                            Joy Flowers Conti
                                            Senior United States District Judge

---

same period. Mrs. Gorton, therefore, did not adduce any evidence to show that Warren Pumps concealed any information about the dangers of asbestos from the Navy. A sua sponte grant of summary judgment is, therefore, appropriate in this case with respect to the claim for fraudulent concealment although Warren Pumps did not specifically raise the issue in its motion for summary judgment.